**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                                        Plaintiff,

                - against -

THE NEW YORK AND PRESBYTERIAN
HOSPITAL,

                                        Defendant.

No. 26 Civ. 2480

**COMPLAINT**

The United States brings this action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, to stop The New York and Presbyterian Hospital ("New York-Presbyterian" or "NYP") from continuing to stifle competition among New York City healthcare providers. NYP's contracts with health insurance companies unlawfully deny patients the choice of insurance plans that prioritize NYP's lower-cost competitors. The United States seeks an order prohibiting NYP from entering into or enforcing these illegal contractual plan design restrictions, which reduce competition among hospitals, raise healthcare costs, and deny consumers seeking healthcare in New York City access to budget-conscious health insurance plans.

**INTRODUCTION**

1.     Healthcare costs weigh heavily on the minds and budgets of American families and businesses. The cost of health insurance is too high, often because many large hospital systems charge high prices. Hospital-driven restraints on the availability of innovative, budget-conscious health insurance plans contribute to these high prices. For years, many price-conscious consumers have sought, and some insurance companies in New York City have tried to offer,

health insurance plans that are designed to give individuals choices that can reduce their healthcare costs.

2.      Americans deserve the benefits of vigorous competition between healthcare providers. Robust competition that is unrestrained by NYP's plan design restrictions would be a powerful mechanism to lower healthcare costs for consumers. But rather than compete on price to serve patients who seek healthcare in New York City, NYP has chosen to prevent competition from rival providers.

3.      NYP is the largest and most powerful hospital system in Manhattan and throughout New York City. For decades, NYP has used its market power to protect its position— as well as its high prices—by using its leverage over commercial health insurers ("payors") to block them from selling health insurance plans that feature hospitals and other providers that offer lower prices.

4.      Consumers benefit when payors negotiate competitive prices with healthcare providers and pass those savings along. Payors can create a budget-conscious insurance plan by designing a network (a group of participating providers) or a benefit structure (*e.g.*, copays and coinsurance) that encourages patients to select providers that offer more competitive prices. For providers, the promise of being featured in this kind of plan is an opportunity to attract more patients by reducing their prices. Providers that elect to keep their prices significantly higher than their rivals' prices risk not being featured in budget-conscious plans and thus losing patient volume.

5.      NYP is one of these high-priced providers. It protects its high prices by imposing contractual plan design restrictions ("plan restrictions") that prevent payors from offering budget-conscious insurance plans. NYP's plan restrictions generally forbid payors from offering

2

plans that either exclude NYP or offer more generous benefits (*e.g.*, lower copays) when patients choose a rival provider. As a result, these restrictions deprive patients of a choice among a full spectrum of competitive health insurance plans, where patients could decide for themselves whether going to NYP for care is worth NYP's high prices.

6.      NYP's anticompetitive conduct insulates it from price competition—or, as NYP calls it, "erosion of rates of payment"—and helps it to maintain its high prices. Without its unlawful contracts, NYP would need to compete more vigorously against other providers, and its rivals could compete to attract additional patients by lowering their own prices or investing in quality improvements. All employers and patients who purchase healthcare in New York City would benefit from lower prices and higher quality as the healthcare marketplace becomes more competitive.

7.      The United States of America brings this civil antitrust action to stop NYP from using unlawful plan restrictions that lessen healthcare competition in New York City in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. NYP's restrictions deter the emergence and development of money-saving health insurance plans and reduce competition among hospitals and other providers on both price and quality. The result is reduced choice of insurance plans, higher healthcare costs, and less competition for high-quality healthcare for employers and patients who purchase healthcare in New York City.

## NEW YORK-PRESBYTERIAN

8.      NYP is a not-for-profit healthcare system with its principal place of business in New York City. NYP owns or manages hospitals, outpatient facilities, and physician groups throughout New York City. Its two flagship facilities are New York-Presbyterian/Columbia University Irving Medical Center and New York-Presbyterian/Weill Cornell Medical Center. It

3

operates a total of eight general acute care hospitals in the New York area, which includes six hospitals in New York City and four hospitals in Manhattan.

9. Although larger and more powerful than its rivals, NYP competes with other hospitals and hospital systems in Manhattan and New York City, including Mount Sinai, NYU Langone, and Northwell, all of which are academic medical centers that offer hospital services. Mount Sinai operates six hospitals in New York City, including four in Manhattan; NYU Langone operates three hospitals in New York City, including two in Manhattan; and Northwell operates six hospitals in New York City, including two in Manhattan.

10. NYP has substantially higher prices than its competitors, even though its major competitors offer similarly high-quality healthcare. For example, NYP's prices are significantly higher than its two largest rivals, NYU Langone and Mount Sinai, which are both academic medical centers with prestigious medical schools, significant research programs, and strong reputations for quality.

11. NYP has market power over payors, which it uses to extract high reimbursement rates for treating commercially insured patients across a range of services. NYP's market power is built on the scale, breadth, and configuration of its providers, including, among other things, its large size, many locations, and strong brand and reputation. NYP leverages its market power to effectively force the major payors that offer commercial insurance to patients in New York City to contract with it on an all-or-nothing basis, which means that the payor must include *all* of NYP's hospitals (including associated outpatient facilities and other healthcare services) in its networks if it wants to have *any* NYP facilities or services in its network. Payors cannot resist this exercise of market power because they cannot viably do business in New York City without at least one plan that includes access to NYP's hospitals. NYP's market power is further

4

evidenced by its ability to impose on payors the anticompetitive plan restrictions that are the focus of this Complaint.

12. NYP knows the implications of its plan restrictions. In a recent strategic planning document, NYP acknowledged that there is "consumer price sensitivity" among patients. If consumers could act on this sensitivity through budget-conscious plans, NYP may experience "pricing pressure" because of its high prices, which may "impact [NYP's] margins"—that is, the profits it garners from treating patients.

## JURISDICTION AND VENUE

13. The Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), and 1345. Plaintiff brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court has personal jurisdiction over NYP under Section 12 of the Clayton Act, 15 U.S.C. § 22. NYP maintains its principal place of business and transacts business in this District.

14. Venue is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22. NYP transacts business and resides in this District and the events giving rise to this action occurred in this District.

15. NYP engages in interstate commerce and in activities substantially affecting interstate commerce. NYP provides healthcare services for which employers, payors, and individual patients remit payments across state lines. NYP also purchases supplies and equipment that are shipped across state lines and otherwise participates in interstate commerce.

## HOSPITAL COMPETITION BENEFITS PATIENTS AND EMPLOYERS

16. Hospitals and hospital systems (all called "hospitals" here for convenience) participate in commercial insurance plans that payors sell directly to individuals and, more often,

to employers or other plan sponsors such as unions. Payors individually negotiate reimbursement rates and contract terms with each hospital so that their members can use the hospital's services. Payors design the commercial features, such as premiums, co-payments, and deductibles, for each plan they sell. Two important plan features that payors negotiate with hospitals are the hospitals and other providers to include in each specific plan and how much members will pay for various healthcare services.

17.     Many employers and other plan sponsors offer their employees or members a choice among insurance plans that differ in their benefit features because consumers value these features differently. Payors generally offer broad network plans that appeal to consumers who are willing to pay higher premiums for the benefit of access to a broad panel of providers in their area. Payors in competitive markets across the United States also generally offer plans that either allow their members to save money by using a more limited network of cost-effective providers or require members to pay more for choosing more expensive providers. These plan designs create incentives for patients to use certain providers and are sometimes called "steered plans" because they may influence patients' decisions about where to receive treatment. These "steering" features reward competition by allowing hospitals or other providers to compete to be included or featured in the plans.

18.     Although not all patients or employers choose to save money by using plans with cost-saving plan designs, patients and their employers deserve the opportunity to make these choices. Health plans that allow patients to save money by choosing not to use high-cost providers may particularly appeal to budget-conscious employers and patients.

19.     Budget-conscious plans can take a variety of forms. But they all emphasize competition, either by creating price competition among hospitals and other providers to be

6

included in a network or by creating competition among hospitals and other providers to attract patients once the provider is included in a health network. The tools that payors can use to create budget-conscious plans can be used either in combination with each other or on their own. Some of these tools are described below.

20.    **Narrow network plans** include a relatively limited set of cost-effective providers. When a payor creates a narrow network, it gives providers an incentive to offer competitive prices to participate in the plan in exchange for the added patient volume from being included in the network. Payors recruit cost-effective providers to participate in narrow networks because they are willing to provide services at lower prices. Providers are also sometimes willing to discount their prices to participate in narrow network products in exchange for the incremental flow of patients that may result from being included in a narrow network. Narrow network plans can charge lower premiums to employers and patients than broad network plans because the payors are not paying as much to providers. Some employers will offer employees a choice between narrow and broad network plans, allowing the employee to pay the additional cost for the broad network plan if the employee values the additional provider options.

21.    **Tiered network plans** use broad networks but reward members with lower out-of-pocket expenses if they choose cost-effective providers in the preferred tier within the network. For example, a plan may charge members different co-insurance payments for hospitals in different benefit tiers. Payors may assign a lower co-insurance payment to lower-cost hospitals to give members an incentive to use hospitals that offer better value. Members of tiered network plans can choose to receive care from the lower-priced preferred tier of providers or to pay more for care from the more expensive tier of providers.

22.    **Centers of excellence** give patients with broad network plans an incentive to seek specific healthcare services from designated groups of providers that offer better value within a broad network. When creating a center of excellence, payors identify specific cost-effective programs of excellent quality—such as orthopedic surgery or oncology programs—and encourage their members to choose care at those facilities by reducing or waiving the fees that the patient must pay. Members can then choose whether to seek care from the "center of excellence" providers that their plan has designated or to seek care from costlier providers at a higher price.

23.    **Site of service steering** is a plan feature that saves patients money by incentivizing them to have procedures done in a lower-cost location (site of service)—such as an ambulatory surgery center—instead of a higher-cost site of service, such as a hospital.

24.    Because these plan design tools allow members to save money by choosing cost-effective hospitals and other providers while still obtaining high-quality care, they create price and quality competition among providers. Not all patients choose plans with these money-saving features, just as not all consumers choose lower-cost products in other areas of their lives. But the ability to make that choice as a consumer is the very essence of competition. NYP impedes this competition by restricting payors from offering budget-conscious plans that would result in more patients choosing rival hospitals and other providers instead of high-priced NYP providers. NYP's restrictions do not allow the essential features of competition to take hold in New York City.

**NEW YORK-PRESBYTERIAN VIOLATES THE SHERMAN ACT**

A.    **New York-Presbyterian's Contractual Restrictions Unlawfully Restrain Competition**

25.    NYP restricts payors from designing and offering budget-conscious plans that promote competition among healthcare providers. Instead, NYP effectively forces payors to include NYP in almost all networks for commercial insurance products and requires that NYP be featured at the most favored level of benefits in each plan, regardless of how NYP's prices compare to its competitors. Illustrating how NYP insists upon this treatment, NYP told a payor that had attempted to exclude it from a network that NYP "expect[s] to be in every network offered." Rather than compete to earn the opportunity to be in payors' networks through lower prices or better value, NYP relies on its market power to impose contractual restrictions to ensure its participation.

26.    NYP's plan restrictions deter the payors that account for a dominant majority of commercial health insurance business in New York City from introducing budget-conscious plans that exclude or charge more for access to NYP's hospitals. Payors that serve New York City already design and offer budget-conscious plans in other parts of the United States. These payors want to provide budget-conscious plans in New York City too but are restrained from doing so by NYP's plan restrictions. For example, a commercial payor repeatedly reported to NYP that it needed "to offer a low-cost insurance option in the NY market," but NYP's unlawful plan restrictions prohibited it from creating a viable product. Similarly, payors have frequently sought to change their plan designs to favor less expensive providers, only to be told by NYP that they are violating their contract with NYP.

**B.**    **Inpatient General Acute Care Hospital Services Are a Relevant Product Market**

27.    Defining a relevant product market helps courts assess, among other things, the products or services for which the defendant wields market power and the anticompetitive impact of the challenged restraints. Although the contractual restrictions imposed by NYP affect both inpatient services and other NYP healthcare services, the sale of inpatient general acute care ("GAC") hospital services to commercial payors and their members is a relevant product market in which to assess the market power that NYP wields and the competitive effects of NYP's contractual restrictions. The market includes sales of such services to payors' individual and group, fully insured and self-funded health plans.

28.    Inpatient GAC hospital services consist of a broad group of medical and surgical diagnostic and treatment services provided to adult and pediatric patients that include the patient's overnight stay in the hospital. Although individual inpatient GAC hospital services are not substitutes for each other (*e.g.*, obstetrics is not a substitute for cardiac services), payors typically contract for the various individual inpatient GAC hospital services as a bundle, the services are sold under similar competitive conditions, and NYP's contractual restrictions have an adverse impact on the sale of all inpatient GAC hospital services. Therefore, individual inpatient GAC hospital services can be analyzed together.

29.    Inpatient GAC hospital services do not include psychiatric care, substance abuse, rehabilitation services, or outpatient services, as these services may be offered by a different set of competitors under different conditions from inpatient GAC hospital services and are not substitutes for inpatient GAC hospital services. The relevant market also does not include sales of inpatient GAC hospital services to government payors, *e.g.*, Medicare (covering people age 65 and up or people with certain disabilities or medical conditions), Medicaid (covering low-income

10

persons), and TRICARE (covering military personnel and families) because a healthcare provider's negotiations for commercial insurance plans are separate from the process used to determine the rates paid to providers by government payors.

30.    There are no reasonable substitutes or alternatives to inpatient GAC hospital services. Consequently, a hypothetical monopolist of inpatient GAC hospital services sold to payors would likely profitably impose a small but significant price increase or other worsening of terms for those services over a sustained period of time.

**C.    Manhattan, and the Four Boroughs of the Bronx, Brooklyn, Manhattan, and Queens, are Relevant Geographic Markets**

31.    Defining relevant geographic markets helps courts assess, among other things, the geographic area in which NYP wields market power and the anticompetitive impact of the challenged restraints. The borough of Manhattan is a relevant geographic market. The following map shows the GAC hospitals located in and around Manhattan.



32.    Manhattan is a geographic market in which market power in the sale of inpatient

GAC hospital services can be exercised. It satisfies the hypothetical monopolist test. A

hypothetical monopolist consisting of all hospitals in Manhattan likely would undertake at least a

small but significant increase in price or other worsening of terms over a sustained period of time

for at least one hospital. Many patients who seek healthcare in New York City prefer to receive

inpatient GAC hospital services at the well-regarded hospitals in Manhattan. Because of this, a

payor without any in-network hospitals located in Manhattan would not be competitive in selling

commercial health plans to many employers and individuals in New York City, including those in

Manhattan. To continue selling commercial health insurance to individuals and employers in

New York City, payors would be forced to accept a price increase imposed by the hypothetical

monopolist.

33. The area comprising the boroughs of the Bronx, Brooklyn, Manhattan, and Queens is also a relevant geographic market (the "Four-Borough Market") in which market power in the sale of inpatient GAC hospital services can be exercised.

34. The Four-Borough Market excludes Staten Island. Few patients using hospitals in the Four-Borough Market consider hospitals located on Staten Island to be a close substitute to hospitals in the Four-Borough Market.

35. The following map shows the GAC hospitals in and around the Four-Borough Market.



36. The Four-Borough Market satisfies the hypothetical monopolist test. A hypothetical monopolist that consists of all hospitals in the Four-Borough Market likely would

undertake at least a small but significant increase in price or other worsening of terms over a sustained period of time for at least one hospital. Patients who seek healthcare in the Four-Borough Market prefer to receive inpatient GAC hospital services at the well-regarded hospitals in the Four-Borough Market and at hospitals that are close to where they live and work. Because of this, a payor without any in-network hospitals located in the Four-Borough Market would not be competitive selling commercial health plans to many employers and individuals in New York City. To continue selling health plans to individuals and to employers in New York City, payors would be forced to accept a price increase imposed by the hypothetical monopolist.

### D.    New York-Presbyterian Wields Market Power to Harm Competition

37.    NYP has market power in inpatient GAC hospital services in Manhattan and the Four-Borough Market. NYP is by far the largest hospital system in both markets. In 2024, NYP's share of inpatient GAC hospital discharges was more than 30 percent in Manhattan and more than 25 percent in the Four-Borough Market.

38.    Market power confers the ability to raise prices above those that could be charged in a competitive market, and NYP's supracompetitive rates provide compelling evidence of its possession and exercise of market power. Unlike firms in a competitive market, NYP does not fear losing patients to its rivals if it charges higher prices than they do. NYP's most senior contracting executive testified that its rivals' offering of lower prices to payors "has no relevance to me." NYP can be unconcerned about its competitors' lower prices because NYP's market power allows it to impose plan restrictions that insulate it from price competition.

39.    The fact that large payors cannot do business in Manhattan or the Four-Borough Market without contracting with NYP is also telling evidence of NYP's market power. Because of NYP's size, brand, and reputation, and the many hospitals and other providers it controls, a

payor selling health insurance plans to individuals and employers in Manhattan and in the Four-Borough Market must have NYP as a participant in at least some of its provider networks to have successful health insurance products. Without NYP—a large hospital system that is well-known by generations of New Yorkers—an insurance plan would not be attractive to the employers and residents who prefer a broad network plan that covers medical care from the full range of providers.

40.     NYP understands that payors must contract with NYP to successfully sell health insurance and exerts this leverage in its negotiations with payors. Payors that sell commercial health insurance plans in the relevant geographic markets have tried to negotiate the removal of plan restrictions from their contracts with NYP, but NYP has summarily refused. The inability of large payors to overcome this costly refusal is further evidence of NYP's market power.

41.     NYP's plan restrictions harm the process by which NYP and other Manhattan and Four-Borough Market hospitals would otherwise compete on the prices of the services they sell. Indeed, NYP recognizes the risk of increased competition that would occur without these restrictions in its disclosures to bond holders, noting that "[i]nsurers may further encourage competition among hospitals and providers on the basis of price, payment terms and quality" and that doing so "may lead to increased competition among hospitals based on price where insurance companies attempt to steer patients to the hospitals that have the most favorable contracts."

42.     NYP uses its market power in inpatient GAC hospital services to impose both high prices and plan restrictions that obstruct the competitive process. These plan restrictions lessen competition between NYP and the other hospitals that provide inpatient GAC hospital services in Manhattan and the Four-Borough Market. Because of NYP's plan restrictions, NYP's

rivals cannot effectively win more commercially insured business by offering lower prices or better value. The restrictions thus help insulate NYP from price competition and make it difficult for other hospitals to win patients and market share from NYP.

43.     NYP recognizes that its plan restrictions protect its high prices. NYP's most senior contracting executive took credit for protecting NYP's plan restrictions and prices. He acknowledged: "Notwithstanding national and local trends to the contrary, [NYP] retained the Hospitals' … terms and conditions that protect against administrative erosion of rates of payment or steerage away from the Hospitals."

44.     NYP further recognizes that protecting its high prices through its plan restrictions benefits NYP's bottom line because payors, employers, and consumers would often seek care elsewhere if they had the option to choose budget-conscious plans. For example, during an internal planning process involving some of NYP's most senior executives, NYP calculated the financial impact to NYP if businesses and patients were able to implement budget-conscious plan designs. According to this analysis, the introduction of tiered plans alone would reduce profits by hundreds of millions of dollars, and other forms of steerage would also cause that same outcome for NYP. Similarly, NYP recognized that efforts by payors to incentivize patients to use providers who offer better value "could impact margins, particularly for standardized procedures."

45.     NYP has admitted that the mere risk that payors might implement steering in the future could increase competition and reduce prices in its market. In a 2023 bond offering memorandum for the issuance of $300 million of bonds, NYP noted that steering would be a risk to NYP's financial standing: "Payors have used the threat of patient steerage [in other markets] . . . to drive provider prices lower."

46.    NYP uses its market power in inpatient GAC hospital services to impose the same plan restrictions on outpatient services. Outpatient services comprise a wide range of diagnostic, treatment, and surgical services that do not require an overnight stay, including but not limited to imaging, infusions, lab services, and less-complex surgeries. Outpatient services can be provided at hospitals but also at freestanding facilities. Outpatient services are included in the same contracts with payors and covered by the same contract terms under which NYP provides inpatient GAC hospital services.

47.    NYP's plan restrictions effectively prevent payors from providing incentives to patients to select outpatient services outside of NYP at facilities or other hospitals that charge less and would thus save money for patients and employers. This effectively prevents rival providers or potential new entrants from competing on price to attract patients. For instance, in 2022, NYP invoked its plan restrictions to stop a payor from charging patients lower copays for certain outpatient radiology services performed at less expensive hospitals or at other facilities rather than at NYP's hospitals.

48.    NYP's plan restrictions protect its high prices in outpatient services. For example, in 2023, NYP stopped a payor from shifting outpatient colonoscopies away from NYP's hospitals. NYP observed that even stopping a single payor from moving outpatient colonoscopies out of NYP's hospitals was "worth ~250k [dollars] to [a physician group in NYP's system] and multiples more to [NYP]."

49.    As a result of this reduced competition from NYP's plan restrictions, individuals and employers who seek healthcare in New York City pay higher prices for health insurance coverage and have fewer insurance plans from which to choose. In the absence of these plan restrictions, payors would be free to offer budget-conscious plans that allow patients to save

money by choosing high-quality and cost-effective hospitals and outpatient services that compete with NYP, such as those offered by NYU Langone or Mount Sinai. NYP might also lower the prices that it charges payors for participating in their broad-network plans if it were forced to compete with its rivals on price through payors' offering or threatening to offer budget-conscious plans.

50.     Entry or expansion by other hospitals in the relevant geographic markets has not prevented NYP from exercising its market power by imposing plan restrictions, nor has it counteracted the resulting actual and likely competitive harms. And in the future, such entry or expansion is unlikely to counteract these harms to competition. Building a hospital anywhere in the Four-Borough Market would entail significant time and cost for construction and permitting. And building a hospital with a strong reputation that can attract physicians and patients is difficult, time-consuming, and expensive. In fact, NYP's plan restrictions raise barriers to entry or expansion for healthcare providers by making it significantly more difficult for them to attract more patients by offering lower prices or more value.

51.     NYP's restrictions on budget-conscious plans do not have any procompetitive effects. Any arguable benefits of NYP's plan restrictions are outweighed by their actual and likely anticompetitive effects and/or could be achieved through less restrictive means. Without these restrictions, NYP can seek to maintain its patient volume and market share by competing to offer lower prices, higher-quality, and better value than its competitors.

## CLAIM FOR RELIEF

52.     Plaintiff incorporates paragraphs 1 through 51 of this Complaint.

53.     NYP has market power in the sale of inpatient GAC hospital services in Manhattan and in the Four-Borough Market.

54. NYP has and likely will continue to negotiate and enforce contracts containing restrictions on budget-conscious plans with commercial payors in the relevant geographic markets. The contracts containing these plan restrictions are contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

55. NYP's contractual restrictions on budget-conscious plans have had, and will likely continue to have, the following substantial anticompetitive effects in the relevant markets, among others:

a. protecting NYP's market power and enabling NYP to maintain at supracompetitive levels the prices of inpatient GAC hospital services;

b. substantially lessening competition among hospitals in their sale of inpatient GAC hospital services;

c. restricting the introduction of innovative insurance products that are designed to achieve lower prices and better value for inpatient GAC hospital services;

d. reducing patients' incentives to seek inpatient GAC hospital services from more cost-effective providers; and

e. depriving New York residents and their employers of the benefits of a competitive market for their purchase of inpatient GAC hospital services.

56. The challenged restrictions unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that the Court enter judgment in its favor and provide the following relief:

a.   adjudge that all of the restrictions on budget-conscious plans in the contracts between NYP and any commercial payors violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.   enjoin NYP, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts a payor from offering, or attempting to offer, plans that give or inform members about financial incentives to use any healthcare provider;

c.   enjoin NYP from substituting other unlawful and anticompetitive means of restricting budget-conscious plans that would replicate the effects of its plan restrictions;

d.   enjoin NYP from retaliating, or threatening to retaliate, against any insurer for offering, or attempting to offer, budget-conscious plans; and

e.   award Plaintiff its costs in this action and such other relief as the Court may deem just and proper.

Dated: March 26, 2026

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

OMEED A. ASSEFI
*Acting Assistant Attorney General*

NICOLE A. SARRINE
*Acting Deputy Assistant Attorney General*

MIRIAM R. VISHIO
*Acting Director of Civil Enforcement
(Conduct and Operations)*

JILL C. MAGUIRE
*Acting Chief, Healthcare and Consumer Products
Section*

GARRETT M. LISKEY
*Assistant Chief, Healthcare and Consumer
Products Section*

_____
Paul J. Torzilli
Senior Litigation Counsel

Karl D. Knutsen
Rahul A. Darwar
Jessica Hollis
Stella Martin
Sean P. Mulloy
David M. Stoltzfus

Trial Attorneys

United States Department of Justice
Antitrust Division
Healthcare & Consumer Products Section
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 476-0547
Email: Paul.Torzilli@usdoj.gov


JAY CLAYTON
United States Attorney for the
Southern District of New York

*/s/ Rachel Kroll*
Rachel Kroll
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2765
E-mail: rachel.kroll@usdoj.gov

*Attorneys for United States of America*

21