**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>        v.<br><br>THE NEW YORK AND<br>PRESBYTERIAN HOSPITAL,<br><br>                              Defendant. | 1:26-cv-02480<br><br>Hon. Paul A. Engelmayer, USDJ<br>Hon. Ona T. Wang, USMJ |

## THE NEW YORK AND PRESBYTERIAN HOSPITAL'S ANSWER

Pursuant to Fed. R. Civ. P. 8(b)(3), The New York and Presbyterian Hospital denies, by

"general denial," all allegations of the Complaint "except those specifically admitted" below.[1]

## PRELIMINARY STATEMENT

NYP shares the United States' stated interest in lowering health care costs for Americans.

But the well-documented driver of rising healthcare costs is concentration in the commercial health

insurance industry.[2]   In this case, however, the Department of Justice ("DOJ") has focused on a

handful of decades-old, industry standard contract provisions that insurers themselves demanded,

which lower prices and guarantee patients access to high-quality care at the hospital of their choice.

---

[1] For any answer where NYP asserts that it does not know or is not aware of a particular alleged fact, NYP specifically means and avers that it "lacks knowledge or information sufficient to form a belief about the truth of [the] allegation," and so denies the allegation under Fed. R. Civ. P. 8(b)(5).  Unless otherwise noted, all emphasis added, internal citations and quotation marks omitted, and capitalizations conformed without brackets.

[2] *Health Insurance Costs are Increasing As Markets Become More Concentrated with Fewer Insurance Companies*, U.S. GOV'T ACCOUNTABILITY OFF. (Dec. 5, 2024), https://www.gao.gov/blog/health-insurance-costs-are-increasing-markets-become-more-concentrated-fewer-insurance-companies-interactive-map.

Challenging such contract provisions will not lower costs; it will enable the nation's largest insurers to enhance their market dominance and expand their profits at patients' expense.

### New York Presbyterian: Two Centuries of Mission-Driven Care

For more than two centuries, NYP has stood at the center of American medicine. NYP traces its roots to The New York Hospital, founded in 1771, and The Presbyterian Hospital, founded in 1868. Today NYP combines the clinical, research, and teaching missions of two of the world's great medical schools – Columbia University Vagelos College of Physicians and Surgeons and Weill Cornell Medicine – into one of the nation's premier integrated academic health systems.

NYP's flagship campuses at Columbia University Irving Medical Center and Weill Cornell Medical Center have pioneered many of the most important advances in modern medicine, including the first-ever infant domino partial heart transplant, the first domino split-liver transplant in adults in the United States, and transcatheter aortic valve replacement surgery. These are not isolated achievements. They result from a sustained, institution-wide dedication to care and millions of dollars of annual investment in support of its non-profit mission to help those in need.

For 22 years, NYP has been ranked among the Best Hospitals by the *U.S. News & World Report*. Last year, it named NYP the Number 1 hospital in New York and one of only twenty hospitals nationwide on its 2025–26 Best Hospitals Honor Roll—the only hospital in the country ranked in the top fifteen in fourteen of fifteen adult specialties.

### Commercial Insurers Dominate The Highly-Competitive Market

#### *NYP Competes in a Highly Competitive Market*

NYP does not have market power, and it cannot dictate terms to insurers. New York has one of the least concentrated hospital markets in the country: a recent Yale study ranks New York the eleventh *least* concentrated state for hospital provider markets (39 states have more

concentrated hospital provider markets than New York).[3]  New York has 188 licensed hospitals,

approximately sixty of which are in New York City.  NYP operates eight acute care hospitals and

two campuses that provide inpatient and outpatient behavioral health care.  The DOJ's Complaint

recognizes New York City hosts many of the nation's large, multi-hospital systems, all of whom

compete head-to-head with NYP—among them Mount Sinai, NYU Langone, Northwell Health,

NYC Health + Hospitals, Maimonides Medical Center, and Montefiore Einstein.

NYP also competes with regional hospitals throughout New York, New Jersey, and

Connecticut for routine cases, and with leading academic centers nationally and internationally for

higher acuity cases.  Notably, in prior antitrust enforcement actions, the DOJ has defined the

appropriate relevant market for insurer-provider negotiations – not as Manhattan or the four

Burroughs – but the entire "downstate New York" metropolitan area, which includes northern New

Jersey, Hudson Valley, and Long Island.[4]

NYP's share of the market is small, far less than the Complaint alleges.  In fact, because

the Complaint seeks to protect the insurers' design of provider networks in the region, the proper

measure of market share is NYP's share of medical expenses under the insurers' plans.  By that

measure, NYP's share is less than 1%.

The Complaint turns NYP's "reputation" for quality against it, alleging that because it

provides high quality medical services, that it is a "must-have" hospital that insurers can't do

without.  But a reputation for excellence is neither direct nor indirect evidence of the legally

---

[3] Zack Cooper, Andrea Harris & Mathilda Hill, *A Ranking of All 50 States by Hospital Consolidation*, Health Care Affordability Lab at Yale: Blog (Mar. 9, 2026), www.healthcareaffordabilitylab.org/commentary-press-release-posts/a-ranking-of-all-50-states-by-hospital-consolidation.

[4] Plaintiffs' Proposed Finding of Fact, *U.S. v. Anthem*, 1:2016-cv-1493, ECF 483, ¶ 404-407 (D.D.C. Dec. 20, 2016).

required market power for the DOJ to bring this type of case. And the Complaint is internally inconsistent because it contends on one hand, that insurers want to exclude NYP from their networks, and at the same time that NYP is a "must-have" hospital system.  The evidence also shows that insurers repeatedly threaten to exclude NYP and several have made good by notifying members of NYP's exclusion.  An institution that insurers can credibly threaten to exclude is, by definition, not a must-have institution and does not possess market power.

### *Insurers Possess Immense Market Power and Bargaining Leverage*

The Complaint concedes that five insurers "account for a dominant majority of commercial health insurance business in New York City."  These five insurers control over ***eighty*** percent of the health insurance market, with Empire alone accounting for more than half.[5]

The insurers' control over patient volume gives them tremendous market power and bargaining leverage.  If contract negotiations break down, insurers can remove NYP from their network, denying coverage for NYP services and forcing their members to use other providers in their extensive networks.  The impact on insurers is minimal and manageable.  The reverse, however, is not true.

The DOJ has repeatedly recognized this imbalance and the anticompetitive consequences that flow from insurers' control over patient steerage.   The DOJ has already alleged the modern healthcare marketplace is dominated by insurers: "today, the industry is dominated by five large insurers," which gives them a "clear advantage and provides opportunities to drive margin growth."[6]  Their ability to earn excess profits is not through economies of scale, but through the exercise of monopsony power.  "Market power arising from [insurers'] market share," the DOJ

---

[5] *Private Enrollment Market Share in New York Counties*, Mark Farrah Assoc. (June 19, 2023), https://www.markfarrah.com/mfa-briefs/private-enrollment-market-share-in-new-york-counties/.

[6] Complaint, *U.S. v. Anthem*, 1:16-cv-01493, ECF 1, ¶ 6 (D.D.C. July 21, 2016).

has found, "is corroborated by [their] demonstrated ability to exercise that power by raising [insurance] prices, restricting [provider] output, erecting barriers to entry, and excluding competitors."[7]

The "All Products" clause that the DOJ now challenges as an exercise of provider power to increase rates is one that the DOJ has previously found is an anticompetitive tool that **insurers** used to maximize their monopsony power and decrease provider rates:

> "[Insurers'] '*All Products*' clause – which requires a [provider] to participate in all of [the insurer's] health plans if [it] participates in any [insurer] plan –significantly increases the volume of business [a provider] would lose if [it] rejected [the insurer's] offered reimbursement on any given plan…. Terminating the provider thus would mean that [the provider] not only would lose [its] own patients that participated in the plan, but also access to other patients…. [This enables the insurer] to *depress … reimbursement rates* …, likely leading to a *reduction in quantity or degradation in the quality* of [provider] services."[8]

The use of the All Products clause reflects a "textbook case of monopsony" in which the "monopsonist depresses the input price it pays below the competitive level by reducing the input quantity it purchases."[9]

### The Challenged Contract Provisions Are Industry-Standard, Insurer-Demanded, and Pro-Competitive

Respectfully, the DOJ also misconstrues the provisions it purports to challenge and the central role they play in the managed care bargain.

The Complaint refers to general "plan restrictions." But NYP's contracts contain no exclusivity provisions, do not require preferential treatment, and do not guarantee NYP any level

---

[7] Complaint, *U.S. v. Blue Cross Blue Shield of Michigan*, 10-cv-14155, ECF 1, ¶ 34 (E.D. Mich. Oct. 18, 2010).

[8] Complaint, *U.S. v. Aetna*, 99-cv-1398, ECF 1, ¶ 32-33 (N.D. Tex.).

[9] *See* Marius Schwartz, DOJ Economics Director of Enforcement, Address at 5th Annual Health Care Antitrust Forum, Northwestern Univ. Sch. of Law: Buyer Power Concerns and the Aetna-Prudential Merger, at II.A (Oct. 20, 1999).

of patient volume or market share.  The Complaint targets industry-standard provisions known as "All Products" provisions:  a provider agrees to offer discounts for its services, and the insurer agrees in turn to include the provider as one of many in-network options for the insurer's enrollees. That is not exclusionary.  It is inclusionary.

The marketplace result of an All Products provision is an Open Access Network—a network that gives patients freedom to access *any* provider of choice without penalty.  It does not require insurers to include other providers in the network, but it also does not prohibit them from doing so.  It only prohibits *discrimination*.  So, from among the multitude of steerage provisions that can be negotiated, an "All Products" provision is about as non-restrictive as possible.

At the other end of the spectrum are Restricted Choice Networks—networks that require *exclusion* of and *discrimination* against certain providers.  The DOJ characterizes them in benign, insurer-friendly language: "narrow networks" or "tiered networks."  But regardless of the label, insurers create these networks using an interrelated system of incentives and penalties – including policy exclusions, elevated deductibles, higher payment rates, and differential co-insurance obligations – to steer patients away from excluded or disfavored providers to the favored ones.

### *The Managed Care Bargain*

The All Products provisions exist because *insurers* proposed them and insisted on them decades ago to obtain the benefit of provider discounts. The economics are straightforward: insurers include NYP in Open Access Networks (meaning insurers will not penalize patients who choose NYP as their provider) which in turn enables NYP to offer lower rates of payment.  Patients gain access to world-class care at lower cost-share. Insurers gain the benefit of a volume discount. NYP gains volume.

The Complaint concedes in Paragraph 4 that negotiations based on plan and network design are procompetitive.  But it incorrectly asserts that the All Products provision prevents that

competition.  The All Products provision *is* the competition over plan design—it is the outcome of NYP successfully competing for in-network status against other hospitals and against being excluded or restricted.

Competition to include or exclude hospital systems in the New York region is intense.  An open, non-exclusionary, non-discriminatory network – guaranteed by an All Products provision – is not a foregone conclusion.  At contract renewal, insurers can create Restricted Choice Networks—and they can try to extract additional concessions from *other* providers in exchange for the promise to exclude NYP.  And, even if they don't ultimately choose to create such networks, they can – and do – use the threat of exclusion to secure more favorable rates.

This is consistent with how a competitive market works.  Volume discounts are efficient and benefit patients.  In high-fixed-cost industries, like hospital care, providers offer lower rates to spread their fixed costs over a larger base of business.  Filling beds with patients is output-enhancing. And that is what NYP does.  Consistent with *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008), and *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.*, 920 F. Supp. 455 (S.D.N.Y. 1996), NYP's rate concessions are procompetitive, incapable of excluding equally efficient rivals, and cannot raise prices above competitive levels.

### *The All Products Provision Is a Reasonably Ancillary, Inseparable Part of the Managed Care Bargain*

When NYP is successful in negotiating for in-network status, the contract reflects the outcome of that *competitive* negotiation. Volume discounts are the product of network inclusion; the two cannot be divorced from each other without fundamentally changing the economics of the parties' negotiations.  It is a quintessential ancillary provision.

The Complaint posits that network exclusion is a solution and seeks to enjoin NYP from competing for inclusion as an in-network provider across any insurer's entire book of business by offering lower prices.

### *NYP Does Not Negotiate on an All or Nothing Basis*

The Complaint incorrectly asserts that NYP competes on an "all-or-nothing basis."  Not so.

The *insurers* have monopsony power.  Just as a *monopolist* raises prices by restricting output, a monopsonist *depresses* prices by restricting its *demand*.  The DOJ argues that these twin evils are "mirror images" of each other.[10]  Here, the Complaint claims that NYP has *seller* power but fails to allege the facts needed to support such an allegation.  For example, the Complaint does not allege that NYP has sought to restrict output.  In fact, NYP has sought to *expand* output and maximize patients' freedom of choice.  Restricted Choice Networks are therefore not evidence of providers' market power, but insurers' power.

The Complaint's claim – that NYP "effectively force[s] the major payors … to contract on an all-or-nothing basis" – is also incorrect.  This allegation ignores the *ex ante* negotiations, while focusing only on the contractual provisions *ex post* after the negotiations have ended.  *Ex ante*, NYP competes for the incremental volume insurers may wish to steer away from it through Restricted Choice Networks.  When NYP succeeds in keeping the network open, the All Products provision operates as intended.  That is competition in action.  The alternative would be to permit NYP's *competitors* to pay insurers to exclude or discriminate against NYP, but to prevent NYP from responding with a competitive offer of its own.

---

[10] Schwartz, *Buyer Power Concerns*, *supra* note 8, at II.A (1999) ("The textbook case of monopsony is the mirror image of monopoly.*"*); DOJ Supp. Mem. on the Buy-Side Case, *U.S. v. Anthem*, 1:16-cv-1493, ECF 410, at 5 (D.D.C.) ("monopsony is the 'mirror image' of monopoly.")

NYP does not require insurers to negotiate on an "all or nothing" basis and NYP has often agreed to modify, limit, or delete the All Products provision to accommodate insurer network designs.

### *Restricted Choice Network Reduce Price Competition; Open Access Networks Preserve It*

The Complaint alleges that Restricted Choice Networks benefit patients because they preserve price competition, while Open Access Networks eliminate it.  NYP respectfully disagrees. Healthcare markets involve two stages of competition: provider competition for network inclusion in stage one, and provider competition for patients in stage two.  Open Access networks maximize price competition at both stages.[11]

The Complaint focuses only on stage one and says that the market is devoid of price competition at stage two because patients are insured and insulated from price at point of care. Not so.  Insurers design their plans to *maximize* stage two price competition among in-network providers, using a combination of deductibles, policy limits, and co-insurance.  These plan features cause patients to consider cost and, consequently, provide strong incentives for providers to offer attractive rates.

Restricted Choice Networks, in contrast, eliminate *ex post* price competition.  They exclude providers not based on the *provider's* price, but the *insurer's* discriminatory penalties.  As such, excluded providers have no practical ability to compete against favored providers.  Restricted

---

[11] "Price" is used to refer to (1) what consumers pay for health insurance; (2) the negotiated rates of payment NYP receives from insurers; and (3) the charges NYP uses for itemized bills and which may appear in statements of patients who are not insured.  How prices for (3) are set is a complicated technical process and not related to competition, market demand, and supply.  NYP's revenue collected on the basis of charges or even a percent discount of charges is not material. This litigation is about (1) and (2).

Choice Networks therefore only permit stage two price competition among *favored* providers, not the full slate of providers that would compete in Open Access Networks.

That Open Access Networks enhance price competition is exactly why sophisticated insurers – who design plans for their own commercial advantage – have gravitated towards them. As the Supreme Court recognized, "*there is nothing inherently anticompetitive about … anti-steering provisions*."[12]  Insurers use them, not just with NYP but with all types of hospitals – large and small, high-priced and low – because that is how they negotiate maximum discounts and provide patients with the choices they want.

**<u>NYP's Contracts Do Not Produce Anticompetitive Effects</u>**

Anticompetitive effects require competitive foreclosure: a reduction in the number of competitors or an increase in rivals' marginal costs. The Complaint alleges neither.  It identifies no hospital exit, forestalled entry, or rival scale impairment.  Nor could it.  NYP's contracts do not prevent insurers from designating other providers as in-network providers.  Other hospitals remain free to compete for patients just as NYP does.

Rather than allege any output reduction, this Complaint alleges that NYP's rates are too high, and attributes that not to NYP's quality and reputation but to the All Products provision.

The Complaint alleges that NYP's "quality," "brand," and "reputation" make it a "must-have" hospital.  Yet, it also alleges that those same attributes would not enable NYP to set rates that reflect those attributes.   Both sets of allegations cannot be true at the same time.  If NYP provides high quality services, then an arms-length negotiation over rates will reflect that quality. That has nothing to do with market power or the All Products provision.

---

[12] *Ohio v. Am. Express Co.*, 585 U.S. 529, 547 (2018).

10

Finally, the DOJ claims that NYP harmed the insurance market—a market in which it does not compete.  In its view, if the Court enjoins NYP from competing for network inclusion, insurers would create more Restricted Choice Networks, and employers would foist those restrictive plans on their employees.  But this speculative chain of events does not justify penalizing patients who want to obtain care at NYP or preventing NYP from engaging in arms-length negotiations when insurers seek to utilize discriminatory tactics. In fact, the Restricted Choice Networks sought by the Complaint can reduce patient choice and shrink the volume providers have to spread within their fixed costs.  Accordingly, most insurers have chosen to negotiate with NYP on a non-restrictive, non-exclusionary basis, as reflected in the All Products provisions the Complaint challenges.

The principal effect of the requested relief would be to increase profits of the nation's dominant insurers.  As the D.C. Circuit has noted, because insurers have "monopsony power" and operate in "highly concentrated markets," they "are less constrained by competition and thus tend to find it more profitable to *capture* medical savings and *increase* premiums."[13]  That is the opposite of what Congress wanted when it passed the Sherman Act.

And even if it did, the principal effect of the requested relief would be to increase   profits of the nation's dominant insurers.  As the D.C. Circuit has noted, because insurers have "monopsony power" and operate in "highly concentrated markets," they "are less constrained by competition and thus tend to find it more profitable to *capture* medical savings and *increase* premiums."[14]  That is the opposite of what Congress wanted when it passed the Sherman Act.

NYP's answer to the Complaint's specific allegations follows.

---

[13] *United States v. Anthem*, 855 F.3d 345, 453 (D.C. Cir. 2017) (emphasis added).

[14] *United States v. Anthem*, 855 F.3d 345, 453 (D.C. Cir. 2017) (emphasis added).

The United States brings this action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, to stop The New York and Presbyterian Hospital ("New York-Presbyterian" or "NYP") from continuing to stifle competition among New York City healthcare providers. NYP's contracts with health insurance companies unlawfully deny patients the choice of insurance plans that prioritize NYP's lower-cost competitors. The United States seeks an order prohibiting NYP from entering into or enforcing these illegal contractual plan design restrictions, which reduce competition among hospitals, raise healthcare costs, and deny consumers seeking healthcare in New York City access to budget-conscious health insurance plans.

**Answer:** NYP's contracts lower prices, increase access and patient choice, and benefit consumers. NYP respectfully submits that the order the Complaint seeks here would do the opposite. To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

## INTRODUCTION

1. Healthcare costs weigh heavily on the minds and budgets of American families and businesses. The cost of health insurance is too high, often because many large hospital systems charge high prices. Hospital-driven restraints on the availability of innovative, budget-conscious health insurance plans contribute to these high prices. For years, many price-conscious consumers have sought, and some insurance companies in New York City have tried to offer, health insurance plans that are designed to give individuals choices that can reduce their healthcare costs.

**Answer:** NYP admits that the costs of healthcare *insurance* weighs on the minds and budgets of American families and businesses. The reason for the high cost of health insurance, however, is that commercial insurance market is highly concentrated and dominated by just five insurers. The DOJ has repeatedly recognized that these insurers possess market power and are largely responsible for the high cost of health care in the country.

Consumers, the Complaint alleges, are seeking plans that reduce healthcare costs through the use of network restrictions and differential cost-sharing that penalize patients in order to steer them away from certain providers that those consumers prefer. This further assumes that any resulting reimbursement reductions will first be passed through by insurers to employers and then from employers to employees in the form of lower premiums or other economic benefits. But that assumption is speculative, particularly in a highly concentrated insurance market where insurers may retain all of the savings. The Complaint also does not adequately account for the burdens

12

imposed on patients and families when plan designs limit access to preferred providers or materially increase out-of-pocket costs for obtaining care from those providers.

The Restricted Choice Networks sought by the Complaint can reduce patient choice and shrink the volume providers have to spread their fixed costs. Accordingly, most insurers have chosen to negotiate with NYP on a non-restrictive, non-exclusionary basis, as reflected in the All Products provisions the Complaint challenges. In the few instances where insurers have experimented with Restricted Choice Networks and have presented NYP with concrete economic proposals for NYP's exclusion, NYP has negotiated on that basis.

To the extent not expressly admitted, NYP denies all allegations of this Paragraph.

2. Americans deserve the benefits of vigorous competition between healthcare providers. Robust competition that is unrestrained by NYP's plan design restrictions would be a powerful mechanism to lower healthcare costs for consumers. But rather than compete on price to serve patients who seek healthcare in New York City, NYP has chosen to prevent competition from rival providers.

*Answer:* NYP respectfully denies the conclusory assertion that NYP has not "competed on price." NYP vigorously competes to remain in network with insurers, and American consumers have benefited tremendously from the increased choice that NYP has secured for them. NYP has not restrained any insurer's plan designs; it has negotiated based on the plan designs they have presented to NYP. NYP has also repeatedly adjusted its rates of payment in response to insurers' threats to exclude NYP from their networks.

The Complaint does not identify any instances in which "rival providers" were prevented from competing on price. The fact that they charge different prices for their services proves that price competition among providers is robust, not restrained.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

3. NYP is the largest and most powerful hospital system in Manhattan and throughout New York City. For decades, NYP has used its market power to protect its position—as well as its

13

high prices—by using its leverage over commercial health insurers ("payors") to block them from selling health insurance plans that feature hospitals and other providers that offer lower prices.

*Answer:* Denied.

NYP is not the largest or most powerful hospital system in Manhattan or New York City. NYP's market share is in the low teens or less, and NYP is not the city's largest health system. Health + Hospitals alone has over 20% market share, and Mount Sinai, Montefiore Health System, NYU Langone Health, and Northwell are of similar size to NYP. NYP also competes with hospitals outside New York City, both for patients that live or work there, or located elsewhere.

NYP has not blocked insurers from selling insurance plans that feature hospitals and other providers that offer lower rates of payment. To NYP's knowledge, no insurer has been blocked from selling any insurance plan that features hospitals and other providers that offer lower rates. NYP's contracts do not exclude any providers. They maximize patient choice and provider competition—they do not "block" or "restrict" it.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

4.      Consumers benefit when payors negotiate competitive prices with healthcare providers and pass those savings along. Payors can create a budget-conscious insurance plan by designing a network (a group of participating providers) or a benefit structure (e.g., copays and coinsurance) that encourages patients to select providers that offer more competitive prices. For providers, the promise of being featured in this kind of plan is an opportunity to attract more patients by reducing their prices. Providers that elect to keep their prices significantly higher than their rivals' prices risk not being featured in budget-conscious plans and thus losing patient volume.

*Answer:* Consumers benefit from plan designs that offer maximum choice without penalties for using their preferred providers. NYP's contracts ensure exactly that.

Insurers use plan design to maximize their control over patient steerage to exploit their monopsony power and bargaining leverage in negotiations with providers. By imposing a range of incentives and penalties on their own members, insurers can steer patients to specific providers. Insurers then negotiate with providers based on the market power they amassed by placing patient

14

choice under their exclusive control. In this paragraph, the Complaint concedes that the ability to *restrict* patient choice is what provides insurers with "an opportunity to [offer providers] more patients."

Patients do not benefit when insurers exercise that control. Beyond the obvious harm of restricted choice itself, patients do not directly realize the benefits of insurers' rate negotiations. To the extent patients perceive the costs of care, it is only through the system of incentives and penalties the insurer has imposed to *deter* care or maximize *control* over steerage. That generates substantial profits for insurers. And because there are only five major insurers – which the Complaint concedes account for a "dominant majority of commercial health insurance business in New York City" – they "are less constrained by competition and thus tend to find it more profitable to *capture* medical savings and *increase* premiums."[15] Put simply, it is not accurate to suggest that rate negotiations with payors over network access increase employees' wages.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

5.        NYP is one of these high-priced providers. It protects its high prices by imposing contractual plan design restrictions ("plan restrictions") that prevent payors from offering budget-conscious insurance plans. NYP's plan restrictions generally forbid payors from offering plans that either exclude NYP or offer more generous benefits (e.g., lower copays) when patients choose a rival provider. As a result, these restrictions deprive patients of a choice among a full spectrum of competitive health insurance plans, where patients could decide for themselves whether going to NYP for care is worth NYP's high prices.

***Answer:*** NYP is not a high-priced provider. Its rates reflect the substantial investment NYP has made in its facilities, its people, and its commitment to cutting-edge care. On an apples-to-apples basis, and accounting for patient mix, quality, and acuity, NYP's prices are comparable with those of other similarly situated health care providers.

---

[15] Cmplt. ¶ 26; *United States v. Anthem*, 855 F.3d 345, 453 (D.C. Cir. 2017) (emphasis added).

Those rates are also the product of arm's-length negotiations with insurers, who have successfully exploited their market power, bargaining leverage, and control over patient steerage to obtain significant volume discounts from NYP.

NYP's contracts do not impose any plan design restrictions on insurers. They reflect the *outcome* of negotiations in which insurers have unilaterally decided that it is better to maintain Open Access Networks than to discriminate against specific providers. They make that choice because they know they cannot steer the same patient twice. If insurers force a patient to go to Provider A, they cannot simultaneously force the same patient to go to Provider B. So, insurers must choose: discriminate among providers through Restricted Choice Networks or let patients decide through Open Access Networks.

The Complaint posits that Restricted Choice Networks should be more common. But in deciding to keep their networks largely open, insurers recognize that, aside from their exercise of monopsony power, the economic benefit of steerage is limited. Steerage to Provider A may prompt it to lower its rates because it can spread its fixed costs over a larger base. But Provider B's rates will increase by a proportionate amount because it will be deprived of that *same* fixed-cost contribution. Since the aggregate cost (fixed and incremental) is constant, the blended rates across both providers are steerage or plan design invariant.

Patients, however, dislike restricted choices in selecting their provider. They perceive out-of-network penalties and denial of benefits as frustrating and unjustified. For that reason, insurers typically choose Open Networks, using only the *threat* of network exclusion as leverage during negotiations. The Complaint does not allege that NYP's contracts prevent insurers from using that threat, and the evidence shows that insurers have effectively wielded that leverage to great effect during NYP's negotiations.

16

Contrary to the Complaint's allegation, NYP does not "forbid" any insurers from offering plans that either exclude NYP or provide greater benefits for using rival providers. Insurers are free to create Restricted Choice Networks that penalize patients for choosing NYP. At contract renewal (or upon notice of termination), insurers can propose to take away the volume they previously or historically committed to NYP. When they do, NYP considers the discounts it can offer or continue to extend to keep the network open—to obtain or maintain the incremental volume the insurer has threatened to take away. In doing so, NYP does not penalize or threaten insurers. It approaches rate negotiations based on the incremental profit principle enunciated in *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008), and *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.*, 920 F. Supp. 455 (S.D.N.Y. 1996).

NYP respectfully denies that patients are "deprive[d] … of choice among [a] full spectrum of [hypothetical] health insurers plans, where patients could decide for themselves whether going to NYP for care is worth NYP's high prices." Restricted Choice Networks do not provide patients with more choice than the Open Access Networks NYP's contracts guarantee. Patients do not benefit from being compelled to participate in plans that deny them care at preferred providers.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

6.    NYP's anticompetitive conduct insulates it from price competition—or, as NYP calls it, "erosion of rates of payment"—and helps it to maintain its high prices. Without its unlawful contracts, NYP would need to compete more vigorously against other providers, and its rivals could compete to attract additional patients by lowering their own prices or investing in quality improvements. All employers and patients who purchase healthcare in New York City would benefit from lower prices and higher quality as the healthcare marketplace becomes more competitive.

**Answer:**  NYP's contracts reflect the outcome of vigorous competition. The Complaint's citation to provisions guarding against insurers' arbitrary "*administrative* erosion of rates of payment" in misplaced—those simply address insurer denials of payment for services rendered.

17

This is not related to steerage or any of the contractual terms at issue here. NYP denies that the All Products provision raises prices or prevents the "erosion of rates."

NYP's rates of payment with a particular insurer would likely be higher, not lower, without the challenged contractual provisions. NYP extends discounts to maintain Open Access Networks that include NYP. If the insurer chose nonetheless to exclude NYP, then NYP would have to spread its fixed costs across a smaller volume base, resulting in rate increases.

NYP denies that its rivals have *decided* not to compete on price or have *intentionally* withheld investment in quality because of NYP's contracts. Every provider competes for inclusion in insurers' networks at stage one, and then competes on price and quality at stage two against every other provider admitted to the network at the same benefit level. Because providers must compete against NYP in Open Access Networks (but not in Restricted Choice Networks that exclude NYP), rivals face *greater*, not less, competition as a result of the challenged provisions.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

7.      The United States of America brings this civil antitrust action to stop NYP from using unlawful plan restrictions that lessen healthcare competition in New York City in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. NYP's restrictions deter   the   emergence   and development of money-saving health insurance plans and reduce competition among hospitals and other providers on both price and quality. The result is reduced choice of insurance plans, higher healthcare costs, and less competition for high-quality healthcare for employers and patients who purchase healthcare in New York City.

*Answer:* This allegation is repetitive of the prior paragraphs. To the extent a further answer is required, NYP denies the allegation in its entirety.

## NEW YORK-PRESBYTERIAN

8.      NYP is a not-for-profit healthcare system with its principal place of business in New York City. NYP owns or manages hospitals, outpatient facilities, and physician groups throughout New York City. Its two flagship facilities are New York-Presbyterian/Columbia University Irving Medical Center and New York-Presbyterian/Weill Cornell Medical Center. It operates a total of eight general acute care hospitals in the New York area, which includes six hospitals in New York City and four hospitals in Manhattan.

18

*Answer:* Admitted.

9.      Although larger and more powerful than its rivals, NYP competes with other hospitals and hospital systems in Manhattan and New York City, including Mount Sinai, NYU Langone, and Northwell, all of which are academic medical centers that offer hospital services. Mount Sinai operates six hospitals in New York City, including four in Manhattan; NYU Langone operates three hospitals in New York City, including two in Manhattan; and Northwell operates six hospitals in New York City, including two in Manhattan

*Answer:* NYP admits that it competes with other hospitals and hospital systems, including Mount Sinai, NYU Langone, Montefiore Einstein, and Northwell Health. NYP also competes with approximately 60 other acute care hospitals in the city, and with scores of others in the New York Metropolitan area, and throughout the nation. However, NYP denies that it is larger or more powerful than its competitors. For example, Northwell is considered by the American Medical Association to be the "largest not-for-profit health system in the Northeast" and is affiliated with the largest physician group in the New York area.[16] Similarly, Health + Hospitals – a city-backed competitor – is also far larger than NYP and possesses substantially greater market power. To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

10.     NYP has substantially higher prices than its competitors, even though its major competitors offer similarly high-quality healthcare. For example, NYP's prices are significantly higher than its two largest rivals, NYU Langone and Mount Sinai, which are both academic medical centers with prestigious medical schools, significant research programs, and strong reputations for quality.

*Answer:* On an apples-to-apples basis, properly adjusted for patient mix, acuity, and other factors, NYP's rates are comparable to those of similarly situated providers.

---

[16] *Northwell Health*, AM. MED. ASS'N, https://www.ama-assn.org/topics/northwell-health (last visited May 19, 2026) ("Northwell is the largest not-for-profit health system in the Northeast, serving residents of New York and Connecticut with 28 hospitals, more than 1,000 outpatient facilities, 22,000 nurses and over 20,000 physicians."); *We are Northwell Fact Sheet* 2, NORTHWELL HEALTH (Apr. 2022), https://www.northwell.edu/sites/northwell.edu/files/2022-04/we-are-northwell-fact-sheet-april-2022.pdf.

The alleged comparison is not based on any disclosed data or any reliable methodology. Both NYU and Mount Sinai are large systems with different mixes of patients and services across many locations. While NYP does not know the specific rates those systems charge or how they negotiate them, industry practice suggest they likely negotiate rates for all their services – and potentially for adjacent services, like physician services – with insurers simultaneously, making it nearly impossible to adjust for implicit bundling and cross-subsidization.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

11.    NYP has market power over payors, which it uses to extract high reimbursement rates for treating commercially insured patients across a range of services. NYP's market power is built on the scale, breadth, and configuration of its providers, including, among other things, its large size, many locations, and strong brand and reputation. NYP leverages its market power to effectively force the major payors that offer commercial insurance to patients in New York City to contract with it on an all-or-nothing basis, which means that the payor must include all of NYP's hospitals (including associated outpatient facilities and other healthcare services) in its networks if it wants to have any NYP facilities or services in its network. Payors cannot resist this exercise of market power because they cannot viably do business in New York City without at least one plan that includes access to NYP's hospitals. NYP's market power is further evidenced by its ability to impose on payors the anticompetitive plan restrictions that are the focus of this Complaint.

***Answer:*** Denied.

NYP has a minimal market share and lacks market power. In addition, the Complaint's market definition is flawed at both at the product and geographic level. The relevant product market is not a single-sided provider market, but the two-sided market in which insurers intermediate transactions between providers and their patients. In this market, the insurers hold all the power.

On the provider side of this market, NYP does not possess market power. The Complaint does not include significant market share in its list of reasons why NYP has market power. Instead, it asserts that NYP has "scale, breadth, and configuration of … providers," which along with a

"strong brand and reputation," makes it desirable to patients.  This is not an allegation of market power—it confirms that NYP cares about the health and well-being of the community.

That insurers and patients choose NYP for some small percentage of their care does not mean that NYP has exercised "power."  NYP does not force major payors to contract with it on an all-or-nothing basis.  Rather, insurers generally prefer Open Access Networks to Restricted Choice Networks.  In the few instances where insurers wanted to penalize patients for exercising their freedom of choice, NYP has not refused to deal with the insurer.  Instead, it has offered to negotiate appropriate exceptions and exclusions from its contracts.  Insurers that want to develop Restricted Choice Networks have always been, and remain, free to negotiate rates with NYP at contract renewal based on the incremental volume associated with their plan design decisions.

To the extent not expressly denied, NYP denies all other allegations in this paragraph.

12.    NYP knows the implications of its plan restrictions. In a recent strategic planning document, NYP acknowledged that there is "consumer price sensitivity" among patients. If consumers could act on this sensitivity through budget-conscious plans, NYP may experience "pricing pressure" because of its high prices, which may "impact [NYP's] margins"—that is, the profits it garners from treating patients.

*Answer:* The Complaint cites a document that simply discusses the well-documented trend toward outpatient ambulatory care—the migration of treatments that historically required inpatient hospitalization to outpatient ambulatory centers.  Nothing in the document refers to "budget-conscious" insurance plans, or the hospital-to-hospital *inpatient* competition at issue here.

The document also contradicts the Complaint's allegations that NYP is insulated from "payer steerage" or immune from the effects of "consumer price sensitivity."

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

## JURISDICTION AND VENUE

13.    The Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), and 1345. Plaintiff brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court

21

has personal jurisdiction over NYP under Section 12 of the Clayton Act, 15 U.S.C. § 22. NYP maintains its principal place of business and transacts business in this District.

**Answer:** NYP admits that it maintains its principal place of business and transactions business in this District.

14. Venue is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22. NYP transacts business and resides in this District and the events giving rise to this action occurred in this District.

**Answer:** NYP admits that it transacts business and resides in this District, and that some of the events giving rise to this action occurred in this District.

15. NYP engages in interstate commerce and in activities substantially affecting interstate commerce. NYP provides healthcare services for which employers, payors, and individual patients remit payments across state lines. NYP also purchases supplies and equipment that are shipped across state lines and otherwise participates in interstate commerce.

**Answer:** NYP notes that the Complaint's allegation that the activities at issue involve conduct that "crosses state lines" defeats its alleged market, which is limited to confines of Manhattan or four of the five Boroughs of New York City. NYP does not otherwise dispute that it engages in interstate commerce.

### HOSPITAL COMPETITION BENEFITS PATIENTS AND EMPLOYERS

16. Hospitals and hospital systems (all called "hospitals" here for convenience) participate in commercial insurance plans that payors sell directly to individuals and, more often, to employers or other plan sponsors such as unions. Payors individually negotiate reimbursement rates and contract terms with each hospital so that their members can use the hospital's services. Payors design the commercial features, such as premiums, co-payments, and deductibles, for each plan they sell. Two important plan features that payors negotiate with hospitals are the hospitals and other providers to include in each specific plan and how much members will pay for various healthcare services.

**Answer:** NYP admits that insurers design plans with specific network participation requirements and benefits levels to attract providers, employers, and patients. But the Complaint's description of the competitive dynamic fails to recognize the two-sided nature of the market or the immense bargaining power and control insurers wield.

22

Healthcare contracting is inherently multi-sided. Insurers, providers, patients, and employers are all linked through a single contracting platform, with insurers at its center, intermediating the relationships among them and controlling which providers patients can see and which patients providers can treat.

Insurers' steerage – accomplished through an interrelated set of incentives and penalties, generally referred to as "plan benefits" – is integral to this two-sided market. If insurers steer too heavily, they deny patients choice, rendering the insurance plan less attractive to them. If insurers steer too lightly, they deliver less volume to favored providers, and network participation becomes less attractive to those favored providers. Insurers must therefore balance both sides of the market through what they unilaterally decide is their profit-maximizing level of steerage.

Armed with the power to steer, insurers then "individually negotiate reimbursement rates and contract terms with each hospital" for network inclusion. The Complaint correctly notes that reimbursement rates and network access provisions – including the provisions it challenges here – are inseparable and ancillary to the resulting agreement. Participation in the network is the *quid pro quo* for the rate concession.

NYP denies, however, that insurers negotiate with providers over "how much members will pay for various healthcare services." Insurers retain sole and exclusive discretion to establish the set of incentives and penalties – colloquially, "plan benefits" – that determine what patients actually pay. Hospitals may negotiate the rates they charge *insurers*, but patients pay what insurers tell them to.

When an insurer creates an Open Access Network, it is agreeing *not* to penalize patients or to discriminate. When an insurer offers to create a Restricted Choice Network in exchange for a

rate concession from a favored provider, it is, by definition, promising to penalize patients who use excluded providers.

NYP has only affirmatively negotiated to participate in Open Access Networks; and has not requested that any insurer penalize patients or discriminate against its rivals. NYP has not asked for or agreed to any exclusionary network participation agreement. NYP has declined to participate in such Restricted Choice Networks, believing that patients should be free to obtain care at the provider of their choice. NYP declined a demand for additional rate discounts from one major commercial insurer in exchange for excluding NYP's rivals from its contemplated Restricted Choice Network. NYP has not entered into any agreement that excludes or restrains competition.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

17.    Many employers and other plan sponsors offer their employees or members a choice among insurance plans that differ in their benefit features because consumers value these features differently. Payors generally offer broad network plans that appeal to consumers who are willing to pay higher premiums for the benefit of access to a broad panel of providers in their area. Payors in competitive markets across the United States also generally offer plans that either allow their members to save money by using a more limited network of cost-effective providers or require members to pay more for choosing more expensive providers. These plan designs create incentives for patients to use certain providers and are sometimes called "steered plans" because they may influence patients' decisions about where to receive treatment. These "steering" features reward competition by allowing hospitals or other providers to compete to be included or featured in the plans.

*Answer:* This allegation concerns the variety of health plans insurers offer in the insurance market—a market in which NYP does not participate and over which it has no control.

NYP does not know what plans insurers offer employers.

The Complaint confirms that this case involves the system of incentives and penalties insurers use to control patient provider choice, otherwise referred to as "steering." These plans restrict patient choice by making it uneconomical to seek care at providers the insurer disfavors. In effect, a patient who uses a disfavored provider is forced to pay twice for coverage: first, when

24

the patient pays premiums for coverage (often through direct payroll deductions), and again when the insurer denies full coverage at point of care.  The Restricted Choice Network plans the Complaint refers to as "Steered Plans" thus impose significant harm to patients who are channeled into them by their employers.

Steering does not "reward" competition.  It aggregates the individual purchases of patients and channels them through a single gatekeeper—the insurer.  But the DOJ previously conceded that this control gives the insurer significant monopsony power, which they use to depress reimbursement rates, "likely leading to a reduction in quantity or degradation in quality."[17]  The DOJ has previously alleged that insurers in the downstate New York market – including New York City – operate in a highly concentrated buyside insurer market and presumptively exercise monopsony power in their dealings with providers.[18]

To the extent not expressly admitted, NYP denies the allegations of the Paragraph.

18.     Although not all patients or employers choose to save money by using plans with cost-saving plan designs, patients and their employers deserve the opportunity to make these choices. Health plans that allow patients to save money by choosing not to use high-cost providers may particularly appeal to budget-conscious employers and patients.

*Answer:*  Patients and employers deserve the opportunity to choose among the health insurance plans that insurers have decided to offer.  In most cases, however, insurers have chosen to offer plans with Open Access Networks for the reasons explained above.  These plans maximize competition among providers and provide patients with greatest choice.

---

[17] Competitive Impact Statement, *United States v. United Health Grp., Inc., et al.*, 05-cv-02436, ECF 10, at 8 (D.D.C. Mar. 3, 2006).

[18] Plaintiffs' Proposed Finding of Fact, *U.S. v. Anthem*, 2016-cv-1493, ECF 483, ¶ 404-407 (D.D.C. Dec. 20, 2016) (noting that, because of insurers' monopsony power, "reduced payments to providers may compromise quality of care.").

Even within Open Access Networks, insurers retain many ways to steer "budget conscious" patients to lower priced, lower-quality facilities—including co-insurance, deductibles, and policy limits and exclusions. NYP denies that the Restricted Choice Networks would benefit patients or employers.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

19.    Budget-conscious plans can take a variety of forms. But they all emphasize competition, either by creating price competition among hospitals and other providers to be included in a network or by creating competition among hospitals and other providers to attract patients once the provider is included in a health network. The tools that payors can use to create budget-conscious plans can be used either in combination with each other or on their own. Some of these tools are described below.

*Answer:* These so-called "budget conscious" plans all involve Restricted Choice Networks, in which patients are forced to pay *more* for their provider of choice. That benefits neither patients nor competition.

*Ex ante*, Restricted Choice Networks eliminate competition. If the excluded provider were permitted to compete *ex ante* for inclusion in the network, and succeeded, the resulting network would *not* be Restricted Choice Network at all; it would be an Open Access Network, and the contract would contain a provision like the All Products provision the Complaint challenges. In fact, the only way to prevent Restricted Choice Networks from becoming Open Access Networks – and to guarantee, by central planning or judicial decree, a market where Restricted Choice Network plans persist – is to prevent providers from competing to participate in such networks.

That is the antithesis of competition. As the Supreme Court has held, "competition for increased market share is not activity forbidden by the antitrust laws."[19]

---

[19] *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986).

Restricted Choice Networks also eliminate *ex post* competition by preventing excluded providers from competing for patients within the network.  Open Access Networks, by contrast, preserve that competition:  every in-network provider remains free to compete for patients on both *quality and price*.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

20.    **Narrow network plans** include a relatively limited set of cost-effective providers. When a payor creates a narrow network, it gives providers an incentive to offer competitive prices to participate in the plan in exchange for the added patient volume from being included in the network. Payors recruit cost-effective providers to participate in narrow networks because they are willing to provide services at lower prices. Providers are also sometimes willing to discount their prices to participate in narrow network products in exchange for the incremental flow of patients that may result from being included in a narrow network. Narrow network plans can charge lower premiums to employers and patients than broad network plans because the payors are not paying as much to providers. Some employers will offer employees a choice between narrow and broad network plans, allowing the employee to pay the additional cost for the broad network plan if the employee values the additional provider options.

*Answer:*  Narrow network plans are Restricted Choice Networks that penalize patients for using providers the insurer disfavors.  When an insurer promises a provider that it will steer patients to that provider and will penalize patients who use rivals, the favored provider can spread fixed costs across a broader volume base.  The disfavored provider – forced to cover similar fixed costs across a smaller volume base – must proportionately raise its own rates.

Insurers may also use narrow networks to steer patients to lower-*quality* providers, which is a form of quantity or demand suppression associated with the exercise of monopsony power. For example, HMOs, which are a type of health insurance plan, are the quintessential Restricted Choice Narrow Network.  As Judge Posner explained:

> "Many people don't like [HMO's] because of the restriction on the patient's choice doctors or because they fear that HMOs skimp on service…  The HMO's incentive is to keep you healthy if it can but if you get very sick … to let you die as quickly and cheaply as possible…. HMOs compensate for these perceived drawbacks by

charging a lower price…. All that is important [is that] … HMOs are not an unalloyed blessing."[20]

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

21.    **Tiered network plans** use broad networks but reward members with lower out-of-pocket expenses if they choose cost-effective providers in the preferred tier within the network. For example, a plan may charge members different co-insurance payments for hospitals in different benefit tiers. Payors may assign a lower co-insurance payment to lower-cost hospitals to give members an incentive to use hospitals that offer better value. Members of tiered network plans can choose to receive care from the lower-priced preferred tier of providers or to pay more for care from the more expensive tier of providers.

*Answer:*  Tiered networks are Restricted Choice Networks.  Nominally, they include all providers in the network.  But because insurers impose penalties that force patients to forego disfavored providers, lower tiered providers are effectively out-of-network.

Contrary to the Complaint's allegation, the mechanism of exclusion is not patient financial responsibility itself; it is the *discriminatory* use of coinsurance as a penalty.  Non-discriminatory patient financial responsibility – a uniform percentage across all providers (such as 20% of charges) – facilitates stage-two price competition in both Open Access Networks and within tiers of Restricted Choice Networks.  If Provider A charges twice as much as Provider B, the patient's financial responsibility for Provider A is twice that for Provider B, and the patient chooses accordingly.  That is competition operating through price and is a feature of many insurance plans.

Tiered networks are different.  They assign providers to tiers and impose patient responsibility differentials – or other economic terms – that bear no relationship to the *actual* price difference between the providers.  An insurer may, for example, impose a 20% financial responsibility penalty on patients who use a disfavored provider while giving patients who use a

---

[20] *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995).

favored provider a free pass.  That is not proportionate to the provider rate difference and is just a penalty.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

22.    **Centers of excellence** give patients with broad network plans an incentive to seek specific healthcare services from designated groups of providers that offer better value within a broad network. When creating a center of excellence, payors identify specific cost-effective programs of excellent quality—such as orthopedic surgery or oncology programs—and encourage their members to choose care at those facilities by reducing or waiving the fees that the patient must pay. Members can then choose whether to seek care from the "center of excellence" providers that their plan has designated or to seek care from costlier providers at a higher price.

*Answer:*  As the Complaint acknowledges in this Paragraph, the term "Centers of Excellence" as used by insurers is a misnomer.  Insurers make cost-based determinations about the providers to whom they want to steer patients.  They will then award them the moniker "Center of Excellence" using metrics that treat price as a significant, if not predominant, factor alongside a few minimum quality criteria.  That does not make "Centers of Excellence" centers excellent. Nonetheless, insurers use the moniker to create Restricted Choice Networks that penalize patients who choose providers that have not been so designated.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

23.    **Site of service steering** is a plan feature that saves patients money by incentivizing them to have procedures done in a lower-cost location (site of service)—such as an ambulatory surgery center—instead of a higher-cost site of service, such as a hospital.

*Answer:*   NYP admits that insurers could create Restricted Choice Networks by imposing "site of service" policies, restrictions, and penalties.  The policies have nothing to do with provider-to-provider *inpatient* competition, which is the focus of the Complaint's market definition and claim.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

24.    Because these plan design tools allow members to save money by choosing cost-effective hospitals and other providers while still obtaining high-quality care, they create price and quality competition among providers. Not all patients choose plans with these money-saving

features, just as not all consumers choose lower-cost products in other areas of their lives. But the ability to make that choice as a consumer is the very essence of competition. NYP impedes this competition by restricting payors from offering budget-conscious plans that would result in more patients choosing rival hospitals and other providers instead of high-priced NYP providers. NYP's restrictions do not allow the essential features of competition to take hold in New York City.

**Answer:**  Denied.

### NEW YORK-PRESBYTERIAN VIOLATES THE SHERMAN ACT

### A.    New York-Presbyterian's Contractual Restrictions Unlawfully Restrain Competition

25.    NYP restricts payors from designing and offering budget-conscious plans that promote competition among healthcare providers. Instead, NYP effectively forces payors to include NYP in almost all networks for commercial insurance products and requires that NYP be featured at the most favored level of benefits in each plan, regardless of how NYP's prices compare to its competitors. Illustrating how NYP insists upon this treatment, NYP told a payor that had attempted to exclude it from a network that NYP "expect[s] to be in every network offered." Rather than compete to earn the opportunity to be in payors' networks through lower prices or better value, NYP relies on its market power to impose contractual restrictions to ensure its participation.

**Answer:**  NYP denies that it has restricted payors from designing or offering "budget conscious" Restricted Choice Networks.  The Complaint also miscites the document it purports to quote.  The document summarized a junior executive's phone call with an insurer that indicated it was considering creating some unspecified Restricted Choice Network.  The insurer relayed a rumor he heard from some unidentified third-party that NYP would be "ok with being excluded" so long as the insurer agreed to exclude NYP's competitors.  The executive correctly responded that the rumor was inconsistent with NYP's general contracting practices, which is to offer discounts in exchange for NYP's *inclusion*, not for competitors' *exclusion*.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

26.    NYP's plan restrictions deter the payors that account for a dominant majority of commercial health insurance business in New York City from introducing budget-conscious plans that exclude or charge more for access to NYP's hospitals. Payors that serve New York City already design and offer budget-conscious plans in other parts of the United States. These payors want to provide budget-conscious plans in New York City too but are restrained from doing so by NYP's plan restrictions. For example, a commercial payor repeatedly reported to NYP that it needed "to offer a low-cost insurance option in the NY market," but NYP's unlawful plan

30

restrictions prohibited it from creating a viable product. Similarly, payors have frequently sought to change their plan designs to favor less expensive providers, only to be told by NYP that they are violating their contract with NYP

*Answer:* NYP admits that the five insurers that this lawsuit will benefit would represent the "dominant majority of commercial health insurance business in New York City" and have market power in the alleged provider, insurance, and two-sided markets at issue in this case.

NYP denies that NYP has deterred these dominant insurers from introducing Restricted Choice Networks. A customer that buys from Provider A because it offered a better deal has not "deterred" Provider B from competing. Here, the Complaint only alleges that NYP offered attractive rates to insurers to encourage them to keep NYP as an in-network provider. That is not restriction on competition. It is simply an offer to sell a service.

Nor have insurers been restrained from creating and offering Restricted Choice Networks. As noted earlier, several such networks have been offered, and NYP has not refused to do business with the insurers that have offered them.

The Complaint takes out of context a 2017 comment by one insurer who was considering entering into an agreement with a large NYP's competitor to penalize patients who choose NYP. Under the insurer's proposal, the insurer would impose *thousands* of dollars of penalties on *each* patient who chose NYP for their care. Notably, the insurer also believed that the proposed "offering is unattractive and unlikely to have any material enrollment." Nonetheless, NYP offered to negotiate rates based on NYP's exclusion from the proposed Restricted Choice Network.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

**B.    Inpatient General Acute Care Hospital Services Are a Relevant Product Market**

27.    Defining a relevant product market helps courts assess, among other things, the products or services for which the defendant wields market power and the anticompetitive impact of the challenged restraints. Although the contractual restrictions imposed by NYP affect both inpatient services and other NYP healthcare services, the sale of inpatient general acute care

("GAC") hospital services to commercial payors and their members is a relevant product market in which to assess the market power that NYP wields and the competitive effects of NYP's contractual restrictions. The market includes sales of such services to payors' individual and group, fully insured and self-funded health plans.

**Answer:**    A relevant market is a required element in a rule of reason vertical restraint case. NYP denies that the single-sided General Acute Care hospital services market is the relevant market in which to assess insurers' network design and plan benefit decisions.

The relevant market in which to assess insurers' network and plan benefit design decisions is the two-sided network market in which insurers intermediate healthcare transactions between patients and employers on one side and the provider on the other.[21]  On provider side, the insurer negotiates inclusion or exclusion from the network.  On the patient/employer side, the insurer markets plans to employer and designs benefits packages that steer patients to particular providers.

Strong indirect network effects link the two sides.  A broader network – or fewer provider restrictions – makes the plan more attractive to health plan enrollees; a larger enrollee base – or enhanced steering power – makes network participation more attractive to providers.

As such, an insurer can make its plan more attractive to the patients *either* by lowering premiums or by expanding the provider network.  Similarly, the insurer can make participation more attractive to providers either by increasing rates or by attracting or steering more patients. Those are two sides of the same coin, working in opposite directions.  *See* François Bardey & Jean-Charles Rochet, *Competition Among Health Plans: A Two-Sided Market Approach*, 19 J. Econ. &

---

[21] The relevant market is not only a two-sided network market, it is also a two-sided transaction market.  This is most obvious when the insurer acts as a third-party administrator.  In that case, the employer pays the TPA for the care delivered to the patient, and the TPA pays the provider for that same care.  Though partially obscured, the same is true even when the insurer acts as an insurer.  In that case, the risk-diversification function is layered on top of the same transaction market, but there is still an obligation that flows from the insurer to the patient, and a *simultaneous* obligation that flows from the insurer to the provider at the point of care for the service provided.

Mgmt. Strategy 435, 437 (2009) (discussing two-sided network effects and noting "health plans compete for policyholders on one side but also compete to attract physicians on the other").

Elsewhere the Complaint recognizes that the market is a two-sided market, because the alleged anticompetitive effects occur solely on the patient/employer side of the market. The Complaint alleges no provider-side harm—no lessening of output, no reduction in the number of competitors, no forestalled entry, and no increase in rivals' marginal costs. But on the patient/employer side, the Complaint alleges price effects, including reduced availability of "budget-conscious health insurance plans." Providers neither purchase nor sell the plans and don't participate in that side of the market.

Because insurers operate in a highly concentrated market, in which they "account for a dominant majority of commercial health insurance business in New York City," they possess significant market power, which allows insurers to profit from spread between the two sides of the market—the rates charged by the provider and the fees paid by the patient or employer.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

28.    Inpatient GAC hospital services consist of a broad group of medical and surgical diagnostic and treatment services provided to adult and pediatric patients that include the patient's overnight stay in the hospital. Although individual inpatient GAC hospital services are not substitutes for each other (e.g., obstetrics is not a substitute for cardiac services), payors typically contract for the various individual inpatient GAC hospital services as a bundle, the services are sold under similar competitive conditions, and NYP's contractual restrictions have an adverse impact on the sale of all inpatient GAC hospital services. Therefore, individual inpatient GAC hospital services can be analyzed together.

*Answer:* Denied.

"In the United States today, most hospital care is bought in two stages. [*First*,] insurers and hospitals negotiate" over network inclusion and reimbursement rates; *second*, "hospitals

33

compete to attract patients."[22]  Here, the Complaint's claims are focused on the first stage of the competition—the terms on which insurers negotiate with providers for inclusion in or exclusion from insurers' networks.  So, if the Court were to determine, over NYP's objection, that the appropriate market is single-sided, the relevant market would be the collection of healthcare services insurers purchase from providers for inclusion in their health plans in stage one, not the individual services a particular patient may purchase from the hospital in stage two.

Insurers do not enter into separate contracts for the purchase of individual services at point of care.  They enter into annual or multi-year contracts with providers for network inclusion for a comprehensive array of healthcare services across broad geographic regions in order to assemble a "network" or roster of providers for the comprehensive plans they offer to employers.

No insurer has negotiated with NYP for just GAC services in Manhattan or the Four Boroughs.  As such, there is no *stage one* market for GAC services in Manhattan because no insurer enters into individually negotiated contracts for such services.  That is, the product the DOJ claims is a "relevant market" is not an actual product that anyone buys or sells.

That is not because NYP "ties" separate services together.  Insurers themselves want to lock in rates across the full panoply of services they offer to enrollees, both for their own economic certainty and to design coherent benefits packages.  They want to list participating providers, not a jigsaw puzzle of provider-specific included and excluded services that patients have to try to piece together.

That is why insurers and providers *throughout the country* – without regard to any market power – routinely contract based on the full range of healthcare services the provider offers.  This results in price negotiations that are largely not service-specific and that often involve cross-

---

[22] *FTC v. Advocate Health Care Network*, 841 F.3d 460, 465 (7th Cir. 2016).

subsidization among the services.  Under *Brown Shoe's* "commercial realities" test, that precludes finding a market is limited to just one component service that *no one* individually contracts for.

Closer to home: Insurers offer employer healthcare plans for the full range of healthcare services patients need.  They do not offer cardiac health insurance, knee-replacement insurance, etc.  This is true even though no insurance plan would be viable without cardiac coverage.  The relevant market is health insurance, not cardiac health insurance, which cannot be individually purchased.  Nor does the Complaint allege, when it asserts anticompetitive effects, that there has been any increase in markets for "GAC health insurance plans" because such plans do not exist.

So too here.  Insurers contract with providers for the full range of services they offer and that insurers want to include in their plans.  Providers, therefore, are competing against all other providers that are, or could reasonably be, included in those plans, even though each one offers a slightly different but overlapping mix of services.

The relevant market, therefore, is the market for healthcare services offered to insurers for inclusion in healthcare plans. In that market, insurers have many options, and pricing dynamics depend on the interrelationships across products and geographies that are included in the plan.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

29.     Inpatient GAC hospital services do not include psychiatric care, substance abuse, rehabilitation services, or outpatient services, as these services may be offered by a different set of competitors under different conditions from inpatient GAC hospital services and are not substitutes for inpatient GAC hospital services. The relevant market also does not include sales of inpatient GAC hospital services to government payors, e.g., Medicare (covering people age 65 and up or people with certain disabilities or medical conditions), Medicaid (covering low-income persons), and TRICARE (covering military personnel and families) because a healthcare provider's negotiations for commercial insurance plans are separate from the process used to determine the rates paid to providers by government payors.

*Answer:*  Denied.

To the extent the Complaint is simply defining what it proposes as a candidate market, the allegation is a definition, not an allegation of fact.  To the extent, the allegation purports to reflect how healthcare services are bought and sold during stage one competition, it is wrong.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

30.    There are no reasonable substitutes or alternatives to inpatient GAC hospital services. Consequently, a hypothetical monopolist of inpatient GAC hospital services sold to payors would likely profitably impose a small but significant price increase or other worsening of terms for those services over a sustained period of time.

***Answer:***  Denied.

C.    **Manhattan, and the Four Boroughs of the Bronx, Brooklyn, Manhattan, and Queens, are relevant geographic markets.**

31.    Defining relevant geographic markets helps courts assess, among other things, the geographic area in which NYP wields market power and the anticompetitive impact of the challenged restraints. The borough of Manhattan is a relevant geographic market. The following map shows the GAC hospitals located in and around Manhattan.



***Answer:***  NYP denies that Manhattan is a relevant geographic market.

Insurers do not negotiate separately for Manhattan GAC hospitals, and there is significant outmigration out of Manhattan to other areas, and significant in-migration from other areas into Manhattan.  Hospitals outside of Manhattan compete successfully for patients that would otherwise go to Manhattan hospitals.

Manhattan residents may choose to go to other boroughs for in-patient hospital services. This is especially true of people who live in "border communities" in Manhattan, which includes

those zip codes closest to neighboring boroughs.  For example, residents in Uptown Manhattan neighborhoods such as Inwood, Washington Heights, or Fort George may choose to receive inpatient GAC services in a hospital in the South Bronx as opposed to one in Manhattan. Moreover, many services performed on a non-emergency basis – the type of which are most susceptible to insurers' steering restraints – involve much larger geographic service areas.

In addition, insurers do not sell health plans just to residents or employers in Manhattan; they sell their plans to employers or members in broader geographic areas.  The provider networks insurers consider the entire geographic reach of their membership and the full spectrum of covered services when deciding which providers to contract.  For that reason, insurers typically do not contract with providers just on the basis of GAC services within a narrow geographic area, but across the entire system.  For example, most insurer plans marketed to employers and patients in New York City include hospitals such as Hackensack Meridian, RWJ Barnabas, Atlantic Health, Yale New Haven, Stamford, and dozens of other hospitals across the three states.  And because different providers and systems provide different but overlapping services and geographic reach, the market must include all overlapping providers.

A hypothetical monopolist of a GAC services in Manhattan could not profitably increase prices above competitive levels.  Competing systems can defeat any such increase by offering offsetting discounts on other services or in other regions.  For example, NYU operates a large network of Ambulatory Centers and can, if it wants to, cross-subsidize lower GAC rates at its flagship hospitals with higher ASC rates, or vice versa.  Northwell too has many facilities outside of Manhattan and can cross-subsidize lower Manhattan GAC rates with higher rates elsewhere. Each of these large systems negotiate with insurers on a system-wide, integrated basis, not on a piecemeal hospital-by-hospital, or service-by-service basis.  The Complaint's proposed

37

implementation of the hypothetical monopolist test ignores this.  But a geographic or product market that ignores the commercial reality of how services are actually contracted and sold is not a relevant market.

To the extent not expressly admitted, NYP denies all other allegations in this paragraph.

32.    Manhattan is a geographic market in which market power in the sale of inpatient GAC hospital services can be exercised. It satisfies the hypothetical monopolist test. A hypothetical monopolist consisting of all hospitals in Manhattan likely would undertake at least a small but significant increase in price or other worsening of terms over a sustained period of time for at least one hospital. Many patients who seek healthcare in New York City prefer to receive inpatient GAC hospital services at the well-regarded hospitals in Manhattan. Because of this, a payor without any in-network hospitals located in Manhattan would not be competitive in selling commercial health plans to many employers and individuals in New York City, including those in Manhattan. To continue selling commercial health insurance to individuals and employers in New York City, payors would be forced to accept a price increase imposed by the hypothetical monopolist.

***Answer:***  Denied.

As an initial matter, the Complaint's articulation of the "hypothetical monopolist" test misses the mark.  The test asks whether a hypothetical monopolist of all the sellers in the candidate market could profitably impose a small but significant and non-transitory price increase on all the products sold in that market.  The thought experiment is designed to identify which products are reasonably close substitutes and should be considered part of the relevant market, and which products are too far removed and thus not a sufficiently strong constraining force on price.  The thought experiment, however, is not a test of market power or competitive effects within the defined market.  For that reason, the test requires that the price increase apply market-wide within the candidate market, not, as the Complaint alleges, a single price increase by a single hospital within the candidate market.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

33.    The area comprising the boroughs of the Bronx, Brooklyn, Manhattan, and Queens is also a relevant geographic market (the "Four-Borough Market") in which market power in the sale of inpatient GAC hospital services can be exercised.

*Answer:*   Denied.

34.    The Four-Borough Market excludes Staten Island. Few patients using hospitals in the Four-Borough Market consider hospitals located on Staten Island to be a close substitute to hospitals in the Four-Borough Market.

*Answer:*   Denied.  The Complaint's exclusion of areas in the city where NYP does not have a hospital does not comport with any known market definition test.  NYP serves many patients who live or work on Staten Island, meaning that NYP competes for those patients against hospitals that have their physical presence on Staten Island.  For example, Staten Island University Hospital is an academic medical center affiliated with Northwell Health and has been recognized as having one of the top-rated cardiac surgery programs in the United States.  Furthermore, patients in Brooklyn's "border neighborhoods," which includes those zip codes closest to neighboring boroughs, may decide to receive care in Staten Island if they believe it to be higher quality or if the nearest in-network hospital is on Staten Island.  Similarly, residents in South Brooklyn neighborhoods of Bay Ridge, Dyker Heights, Fort Hamilton, and Bensonhurst, may choose to travel to Staten Island if their insurance has Northwell as an in-network provider but does not include systems present in South Brooklyn, such as NYU Langone or Mount Sinai, in network.

To the extent not expressly admitted, NYP denies all other allegations in this paragraph.

35.    The following map shows the GAC hospitals in and around the Four-Borough Market.



*Answer:*  NYP does not have sufficient information to deny or admit that this map is a fair and accurate representation of the information it purports to depict.   NYP denies that this is, in fact, a relevant geographic market.   To the extent not expressly admitted, NYP denies the allegations of this paragraph.

36.    The Four-Borough Market satisfies the hypothetical monopolist test. A hypothetical monopolist that consists of all hospitals in the Four-Borough Market likely would undertake at least a small but significant increase in price or other worsening of terms over a sustained period of time for at least one hospital. Patients who seek healthcare in the Four-Borough Market prefer to receive inpatient GAC hospital services at the well-regarded hospitals in the Four-Borough Market and at hospitals that are close to where they live and work. Because of this, a payor without any in-network hospitals located in the Four-Borough Market would not be competitive selling commercial health plans to many employers and individuals in New York City. To continue selling health plans to individuals and to employers in New York City, payors would be forced to accept a price increase imposed by the hypothetical monopolist.

*Answer:*  Denied.  As set forth in response to Paragraph 27, the HMT test is not satisfied.

**D.    New York-Presbyterian Wields Market Power to Harm Competition**

37.    NYP has market power in inpatient GAC hospital services in Manhattan and the Four-Borough Market. NYP is by far the largest hospital system in both markets. In 2024, NYP's share of inpatient GAC hospital discharges was more than 30 percent in Manhattan and more than 25 percent in the Four-Borough Market.

*Answer:*  Denied.  NYP does not possess market power in the alleged relevant markets or in any well-defined relevant market.   In this paragraph, Complaint seeks to infer market power from market share in its alleged relevant markets.   But even then, NYP's market share is in the low teens.

There are many larger hospitals systems operating in Manhattan and the Four Boroughs, including the City's own Health + Hospitals system and Northwell.  Other systems, such as Mount Sinai, Montefiore, and NYU are also of similar sizes.  And systems that draw patients from the same patient pool are also of similar or larger size.  In addition, NYP faces competition from other academic hospitals and regional hospitals that the Complaint has chosen to exclude.

40

Moreover, the Complaint ignores its own allegations that the five insurers "dominate" the market possess market power, which negates any ability of NYP to restrict output and raise prices above competitive levels.    Indeed, the entire theory of this Complaint is based on output expansion, not output restriction, which is inconsistent with seller power.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

38.    Market power confers the ability to raise prices above those that could be charged in a competitive market, and NYP's supracompetitive rates provide compelling evidence of its possession and exercise of market power. Unlike firms in a competitive market, NYP does not fear losing patients to its rivals if it charges higher prices than they do. NYP's most senior contracting executive testified that its rivals' offering of lower prices to payors "has no relevance to me." NYP can be unconcerned about its competitors' lower prices because NYP's market power allows it to impose plan restrictions that insulate it from price competition.

*Answer:*  Market power in the hands of sellers confers the ability to restrict output, and thereby, raise prices above levels that could be charged in the absence of such output restrictions. Market power in the hands of buyers confers the ability to restrict demand, and thereby, lower prices below the levels that could be charged in the absence of such demand restrictions.  The Complaint alleges facts only demonstrating insurer-side (or buyer-side) market power.

Here, the Complaint only alleges demand restrictions by insurers, not output restrictions by NYP or providers.  The Complaint further concedes that NYP has obtained the incremental volumes associated with the Open Access Networks it challenges by offering lower – not higher – prices.  That pricing pattern reflects buyer or insurer-side market power, not seller or provider side market power.  Indeed, offering lower prices to obtain incremental volume is the essence of competition, and is necessarily procompetitive absent incremental prices below incremental cost (*i.e.*, negative incremental profit) that leads to competitive foreclosure of equally-efficient rivals, which has not been alleged.

NYP's rates of payment do not reflect the possession of market power.  Higher rates for differentiated, higher-quality services are not evidence of market power; they are the expected

41

output of quality competition, especially where quality differences are the product of substantial investment. NYP offers the highest quality healthcare in the world; and it invests in equipment, facilities, and personnel to deliver such exceptional care. The fact that its rates may be higher than some of its other competitors who do not invest as much is not evidence of market power, but superior quality.

The Complaint's citation to a single testimonial snippet does not support its assertion. The actual quote is that "I have told payors for many years, the only thing that matters [is] the costs of doing business… If we negotiate rates payment that are below our costs of doing service, that's not particularly helpful. If other organizations have agreed to lesser amounts, that has no relevance to me." That is *exactly* the type of statement that any firm in a *perfectly* competitive market would make. It is also exactly the type of statement a seller subjected to the awesome power of a monopsonist would make when faced with the monopsonist's threats to restrict demand and depress prices below the competitive level.

The Complaint implies that NYP's contracting executives should give weight to rumors and unverified competitor pricing information is also misplaced. In competitive markets, sellers price their products based on their own costs and may not even know, much less focus on, what rivals are charging for their services. Hospitals often do not have reliable information about their competitors' prices, and so their prices are not relevant during the negotiation process. Moreover, antitrust laws can prohibit certain exchanges of pricing information among rivals and thus competitor's pricing information is irrelevant in negotiations. A lack of consideration of such information does not make each competitor a monopolist.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

39.     The fact that large payors cannot do business in Manhattan or the Four-Borough Market without contracting with NYP is also telling evidence of NYP's market power. Because of

42

NYP's size, brand, and reputation, and the many hospitals and other providers it controls, a payor selling health insurance plans to individuals and employers in Manhattan and in the Four-Borough Market must-have NYP as a participant in at least some of its provider networks to have successful health insurance products. Without NYP—a large hospital system that is well-known by generations of New Yorkers—an insurance plan would not be attractive to the employers and residents who prefer a broad network plan that covers medical care from the full range of providers.

*Answer:* The Complaint's conclusory allegation that NYP is a "must-have" hospital is both incorrect and conflicts with other allegations.

The Complaint asserts that "large payors cannot do business in [the Complaint's incorrectly pled relevant markets] without contracting with NYP." But the Complaint offers no facts to support this assertion. The Complaint only alleges that insurers have opted for Open Access Networks for the majority of their books of business—except when they have chosen not to. That does not establish that NYP is a "must-have" hospital.

Indeed, the Complaint itself acknowledges that insurers have created several Restricted Choice Networks. The fact that these Restricted Choice Networks exist in the market today is evidence that NYP is not a must-have hospital, and also negates the unfounded assertion that NYP negotiates on an "all or nothing" basis.

More fundamentally, the allegation that NYP is a "must-have" hospital is inconsistent with other allegations. If NYP was a "must-have," insurers would not seek to exclude it from their networks because it is a "must-have." Indeed, it is precisely because NYP is *not* a must-have that insurers might want to create Restricted Choice Network plans that exclude it.

That many insurers have chosen to give patients choice by offering Open Access Plans is not evidence that a hospital is a "must-have." All hospitals offer features that make insurers want to include them in-network; that insurers do so does not give each hospital in the network "market power" as a "must-have" hospital.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

43

40.    NYP understands that payors must contract with NYP to successfully sell health insurance and exerts this leverage in its negotiations with payors. Payors that sell commercial health insurance plans in the relevant geographic markets have tried to negotiate the removal of plan restrictions from their contracts with NYP, but NYP has summarily refused. The inability of large payors to overcome this costly refusal is further evidence of NYP's market power.

**Answer:** Denied.

NYP has always negotiated with payors to offer discounts to keep their networks open, non-exclusionary, and non-discriminatory, and where insurers insist on nonetheless imposing penalties on NYP's patients has always offered to negotiate based on the incremental volume for the incremental volume at issue. NYP has not summarily refused to negotiate with insurers over potential network exclusions or insurers' imposition of discriminatory penalties on patients who may prefer NYP.  Instead, it has negotiated consistent with principles articulated in *PeaceHealth* and *Ortho*.

Insurers do sometimes try to renege on their agreement to include NYP as an in-network provider or otherwise breach their contractual commitments.  But mid-contract conduct is governed by contract law, not free market forces.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

41.    NYP's plan restrictions harm the process by which NYP and other Manhattan and Four-Borough Market hospitals would otherwise compete on the prices of the services they sell. Indeed, NYP recognizes the risk of increased competition that would occur without these restrictions in its disclosures to bond holders, noting that "[i]nsurers may further encourage competition among hospitals and providers on the basis of price, payment terms and quality" and that doing so "may lead to increased competition among hospitals based on price where insurance companies attempt to steer patients to the hospitals that have the most favorable contracts."

**Answer:** NYP's contracts reflect the outcome of the ideal operation of the competitive process.

Insurers seek to maximize their discounts by offering to grant non-exclusive, non-discriminatory in-network status to NYP across all of the patient demand the insurer controls.  For its part, NYP has always competed for incremental volume by reducing its rates, consistent with

44

the principles articulated in *PeaceHealth* and *Ortho*. When insurers opt for Open Access Networks, NYP can spread its high fixed costs across a larger patient base, thereby allowing it to reduce rates. The price competition that NYP engages to keep insurers' networks open and non-exclusionary, rather than restricted and discriminatory, reflects competition in action.

And the results of this vigorous competition, when NYP is successful in competing to keep the networks open, are then memorialized in the parties' contract. In some cases, that memorialization takes the form of an express All Products clause (or some variation of it), in which the consideration for NYP's *ex ante* rate reductions is the insurers' express promise to preserve patient choice and keep the network open and non-exclusionary. In other cases, insurers decline to commit to open networks, even where they have no specific plans to create Restricted Choice Networks. In those cases, the parties remain free to renegotiate if the insurer decides to change its practices in ways that undermine the benefits of the bargain they had reached. Either structure reflects the free market reaching competitive outcomes among sophisticated contracting parties.

This is far more procompetitive than the Complaint's proposed remedy in which insurers pay to exclude competitors from insurers' networks. In the DOJ's view, Restricted Choice Networks are more procompetitive than Open Access Networks. But Restricted Choice Networks involve insurers demanding, and providers paying, money to exclude rival providers. NYP has declined to participate in such Restricted Choice Networks, believing that patients should be free to obtain care at the provider of their choice. For example, when a major commercial insurer demanded additional discounts to exclude NYP's rivals from its contemplated Restricted Choice Network, NYP declined.

NYP also denies that NYP's contracts have prevented other providers from competing on price. That price competition exists both *ex ante* and *ex post*. *Ex ante*, other providers lower their

45

prices to prevent themselves from being excluded from the network.  That is, they do exactly what NYP does.  They offer price discounts for inclusion, and when they are successful, the result is that the insurer opts for Open Access Networks, rather than Restricted Choice Networks that exclude them.  The resulting contracts similarly memorialize that outcome, and thus, the All Products provision is, whether *de facto* or *de jure*, endemic in virtually all providers' contracts with all insurer health plans.

NYP's contracts also enhance price competition *ex post*.  Whereas Restricted Choice Networks eliminate *ex post* price competition; Open Access Networks enhance it.  Insurers typically include deductibles, policy limits, and co-insurance provisions as part of the benefits package.  Each of these cause *patients* to choose among in-network providers based, in part, on price.  Providers in Open Access Networks are, therefore, incentivized to set prices in ways that encourage patients to choose them over their rivals.  The *ex post* price competition vanishes in Restricted Choice Networks.  In those networks, the *insurer* penalizes patients for using out-of-network providers, so those providers have no incentive to set prices to compete for patients' business, and consequently, in-network providers do not need to set prices to compete with out-of-network providers.  The steerage penalties in Restricted Choice Networks do all the work, leaving no room for *ex post* price competition.

The Complaint's citation to the "risk factors" section in NYP's SEC filings does not support that the theory that NYP's contracting practices restrict competition.  The SEC filings do not speak to NYP's contracting practices, or the difference between Open Access Networks and Restricted Choice Networks.  It simply reflects the fact that one risk factor for NYP is that insurers possess extreme levels of market power, and can use that power to adversely impact NYP.  Indeed,

the fact that NYP had to disclose this risk factor runs counter to allegations that NYP wields powers and insurers have none.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

42.    NYP uses its market power in inpatient GAC hospital services to impose both high prices and plan restrictions that obstruct the competitive process. These plan restrictions lessen competition between NYP and the other hospitals that provide inpatient GAC hospital services in Manhattan and the Four-Borough Market. Because of NYP's plan restrictions, NYP's rivals cannot effectively win more commercially insured business by offering lower prices or better value. The restrictions thus help insulate NYP from price competition and make it difficult for other hospitals to win patients and market share from NYP.

*Answer:* Prices do not "obstruct" the competitive process. The Sherman Act does not prohibit high or low prices; it prohibits unreasonably exclusionary or restrictive contracts. Prices are not restrictive or exclusionary. *Verizon Commc'ns Inc. v. Trinko*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system"). As noted, NYP's rate reductions – offered to keep networks open – is the antithesis of restrictive conduct and reflects the ideal operation of the competitive process.

NYP's rivals can effectively compete for more commercially insured business in many ways. *First*, providers can compete for Restricted Choice Networks *ex ante* by paying insurers more for exclusionary provisions that exclude NYP from a Restricted Choice Network than NYP is willing to pay to keep the network open and non-exclusionary. *Second*, providers can compete *ex post* by lowering their prices and encouraging patients – who are subject to deductibles, co-insurance, or policy limits – to choose them over their rivals, including NYP. *Third*, providers can compete simply by investing in their facilities, operations, and personnel to provide better quality than they currently offer.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

47

43. NYP recognizes that its plan restrictions protect its high prices. NYP's most senior contracting executive took credit for protecting NYP's plan restrictions and prices. He acknowledged: "Notwithstanding national and local trends to the contrary, [NYP] retained the Hospitals' … terms and conditions that protect against administrative erosion of rates of payment or steerage away from the Hospitals."

*Answer:* Denied.

The Complaint cites the same out-context documentary snippet it cited in Paragraph 6 above. As noted there, the document simply addresses insurers' arbitrary "*administrative* erosion of rates of payment," *i.e.*, insurer policies that relate to insurer's denial of payment for care already provided. That is unrelated to steerage or any of the contractual terms at issue here. Moreover, the separate comment – joined by the disjunctive "or" – relating to insurer steerage merely demonstrates that NYP was forced to continue offering substantially discounted rates to keep that insurer's network open. To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

44. NYP further recognizes that protecting its high prices through its plan restrictions benefits NYP's bottom line because payors, employers, and consumers would often seek care elsewhere if they had the option to choose budget-conscious plans. For example, during an internal planning process involving some of NYP's most senior executives, NYP calculated the financial impact to NYP if businesses and patients were able to implement budget-conscious plan designs. According to this analysis, the introduction of tiered plans alone would reduce profits by hundreds of millions of dollars, and other forms of steerage would also cause that same outcome for NYP. Similarly, NYP recognized that efforts by payors to incentivize patients to use providers who offer better value "could impact margins, particularly for standardized procedures."

*Answer:* The first document the Complaint cites is unrelated to the contractual provisions the Complaint challenges, or the creation of Restricted Choice Networks. It reflects analysis of hypothetical situations in which the federal or state government implements direct *rate regulation*, or insurers exercising their right to entirely exclude NYP from their networks or its functional equivalent—the banishment of NYP into non-economic and discriminatory tiers. The discussion about such Restricted Choice Networks relates solely to the loss of *volume*. It is unrelated to prices or rates.

Moreover, the document undermines the Complaint's characterization that NYP is a "must-have" and an insurer cannot credibly exclude NYP from the network. A genuine must-have hospital would not project hundreds of millions in lost profit from network exclusion because exclusion of that magnitude would not be possible. That NYP modeled such losses demonstrates the market power of insurers, and NYP's corresponding lack of market power.

The second document is just a repeat of the same document cited in Paragraph 12. It is unrelated to in-patient competition, competition among GAC hospitals, or the contractual provisions at issue.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

45.    NYP has admitted that the mere risk that payors might implement steering in the future could increase competition and reduce prices in its market. In a 2023 bond offering memorandum for the issuance of $300 million of bonds, NYP noted that steering would be a risk to NYP's financial standing: "Payors have used the threat of patient steerage [in other markets] . . . to drive provider prices lower."

**Answer:** This is a rehash of the same document the Complaint cites in Paragraph 41. The Complaint's citation to the risk factors section of NYP's SEC filings does not support its claims.

The observation that insurers have used threats of patient steerage to lower rates is true, both in this market and in other markets. Indeed, the Complaint's theory is premised on the notion those threats do *not* occur in this market because those threats are not credible. The fact that NYP recognizes steerage as a risk factor proves that NYP is not a must-have hospital and that insurers can – and do – credibly threaten to discriminate against NYP in Restricted Choice Networks.

Indeed, insurers routinely – and effectively – threaten to exclude NYP from their networks. In several instances, insurers have gone so far as to publicly inform members that NYP is being excluded as a way to force NYP to lower its rates. The threat to exclude NYP from the network is the ultimate form of "patient steerage," and insurers have wielded that weapon to force NYP to

lower rates.  Insurers' use of this threat also demonstrates that NYP is not a musthave provider, as the Complaint alleges, and that insurers, not NYP, possess the market power in the relationship.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

46.     NYP uses its market power in inpatient GAC hospital services to impose the same plan restrictions on outpatient services. Outpatient services comprise a wide range of diagnostic, treatment, and surgical services that do not require an overnight stay, including but not limited to imaging, infusions, lab services, and less-complex surgeries. Outpatient services can be provided at hospitals but also at freestanding facilities. Outpatient services are included in the same contracts with payors and covered by the same contract terms under which NYP provides inpatient GAC hospital services.

**Answer:**  Outpatient services are not part of the Complaint's defined relevant markets. Nor is there any allegation that NYP possesses market power over outpatient services.

That insurers want to contract with NYP for the full range of services that NYP offers does not suggest that NYP has, or is using, market power when contracting.  Virtually every hospital in the nation that offers any form of outpatient services contracts with insurers for the provision of both in-patient and out-patient services.  That does not mean that every hospital has restrained competition; it reflects the fact that insurers find it efficient to contract for both in-patient and out-patient services at the same time.

Moreover, the Complaint's theory that NYP uses inpatient market power to impose anticompetitive terms in a separate outpatient market is a leveraging or tying theory devoid of any allegations relating to actual tying or anticompetitive effects in the outpatient market.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

47.     NYP's plan restrictions effectively prevent payors from providing incentives to patients to select outpatient services outside of NYP at facilities or other hospitals that charge less and would thus save money for patients and employers. This effectively prevents rival providers or potential new entrants from competing on price to attract patients. For instance, in 2022, NYP invoked its plan restrictions to stop a payor from charging patients lower copays for certain outpatient radiology services performed at less expensive hospitals or at other facilities rather than at NYP's hospitals.

***Answer:***  Nothing in any NYP contract prevents patients from selecting outpatient services from other providers.  NYP has offered rates to incentivize insurers to maintain Open Access Networks.  Insurers that have chosen to do so agree not to discriminatorily penalize patients for choosing their preferred provider.

The Complaint's reference to an *ex post* breach of contract by one insurer – after obtaining significant discounts *ex ante* – does not suggest that the contract the insurer originally negotiated and that provides for open access is anticompetitive.  Nor does the document suggest that the insurer was prevented from lowering the co-pay at other facilities.  The insurer could – consistent with the contract it entered – also lower the co-pay for patients that use NYP's radiology services.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

48.      NYP's plan restrictions protect its high prices in outpatient services. For example, in 2023, NYP stopped a payor from shifting outpatient colonoscopies away from NYP's hospitals. NYP observed that even stopping a single payor from moving outpatient colonoscopies out of NYP's hospitals was "worth ~250k [dollars] to [a physician group in NYP's system] and multiples more to [NYP]."

***Answer:***  The cited document says nothing about protecting high prices, competition among hospitals, or negotiations for network inclusion or exclusion.

To the extent not expressly admitted, NYP denies the allegations of this Paragraph.

49.      As a result of this reduced competition from NYP's plan restrictions, individuals and employers who seek healthcare in New York City pay higher prices for health insurance coverage and have fewer insurance plans from which to choose. In the absence of these plan restrictions, payors would be free to offer budget-conscious plans that allow patients to save money by choosing high-quality and cost-effective hospitals and outpatient services that compete with NYP, such as those offered by NYU Langone or Mount Sinai. NYP might also lower the prices that it charges payors for participating in their broad-network plans if it were forced to compete with its rivals on price through payors' offering or threatening to offer budget-conscious plans

***Answer:***  NYP denies that its contracting practices have any discernible effect on the prices that employers or patients pay for coverage.

51

As the Complaint concedes, any consumer harm in this case must manifest at the insurance premium stage—yet the causal chain between NYP's contracts and the premiums charged by third-party insurers is both outside NYP's control and tenuous at every link.

To the extent any further response is required, NYP denies the allegations of this paragraph.

50.     Entry or expansion by other hospitals in the relevant geographic markets has not prevented NYP from exercising its market power by imposing plan restrictions, nor has it counteracted the resulting actual and likely competitive harms. And in the future, such entry or expansion is unlikely to counteract these harms to competition. Building a hospital anywhere in the Four-Borough Market would entail significant time and cost for construction and permitting. And building a hospital with a strong reputation that can attract physicians and patients is difficult, time-consuming, and expensive. In fact, NYP's plan restrictions raise barriers to entry or expansion for healthcare providers by making it significantly more difficult for them to attract more patients by offering lower prices or more value.

***Answer:***   To prove that a contract unreasonably restrains trade, the DOJ must show that the contract is exclusionary and has foreclosed competition in the relevant market.  This requires an allegation that rivals were forced out business, prevented from entering the market, or their marginal cost of providing the service increased.  The Complaint makes no such allegations.

The Complaint similarly offers no support for its conclusory statement that potential entrants were deterred from entering the market.  Nor could it.  The Complaint acknowledges that nothing in any NYP contract prevents a hospital from being in-network with insurers or competing based on price or other factors for patient volume.

To the extent not expressly admitted, NYP denies the allegations of this paragraph.

51.     NYP's restrictions on budget-conscious plans do not have any procompetitive effects. Any arguable benefits of NYP's plan restrictions are outweighed by their actual and likely anticompetitive effects and/or could be achieved through less restrictive means. Without these restrictions, NYP can seek to maintain its patient volume and market share by competing to offer lower prices, higher-quality, and better value than its competitors.

***Answer:***  Denied.  As set forth above, NYP's contracts – which reflect the negotiated outcome in which NYP offers lower rates to be included in insurers' Open Access Networks – are procompetitive, and reflect exactly the type of competition for market share that the Sherman Act

exalts.  The provisions the Complaint challenges are also reasonably ancillary to the managed care bargain.  Without the challenged provisions, NYP's patients would be stripped of their choice and be subjected to exorbitant penalties set solely at the discretion of powerful insurers.  Similarly, under the Complaint's theory, NYP would alone be prohibited from competing *ex ante* for inclusion in insurers' networks and forced to compete for volume solely *ex post* as an out-of-network provider that must overcome the penalties imposed by insurers.  To the extent not expressly admitted, NYP denies the allegations of this paragraph.

## CLAIM FOR RELIEF

Plaintiff incorporates paragraphs 1 through 51 of this Complaint.

**Answer:**  NYP incorporates by reference its answers to paragraph 1 through 51 above.

52.  NYP has market power in the sale of inpatient GAC hospital services in Manhattan and in the Four-Borough Market.

**Answer:**  Denied.

53.  NYP has and likely will continue to negotiate and enforce contracts containing restrictions on budget-conscious plans with commercial payors in the relevant geographic markets. The contracts containing these plan restrictions are contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer:**  Denied.

54.  NYP's contractual restrictions on budget-conscious plans have had, and will likely continue to have, the following substantial anticompetitive effects in the relevant markets, among others:

 a. protecting NYP's market power and enabling NYP to maintain at supracompetitive levels the prices of inpatient GAC hospital services;

 b. substantially lessening competition among hospitals in their sale of inpatient GAC hospital services;

 c. restricting the introduction of innovative insurance products that are designed to achieve lower prices and better value for inpatient GAC hospital services;

 d. reducing patients' incentives to seek inpatient GAC hospital services from more cost-effective providers; and

53

e.    depriving New York residents and their employers of the benefits of a competitive market for their purchase of inpatient GAC hospital services.

**Answer:** Denied.

55.    The challenged restrictions unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer:** Denied.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that the Court enter judgment in its favor and provide the following relief:

a.    adjudge that all of the restrictions on budget-conscious plans in the contracts between NYP and any commercial payors violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.    enjoin NYP, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts a payor from offering, or attempting to offer, plans that give or inform members about financial incentives to use any healthcare provider;

c.    enjoin NYP from substituting other unlawful and anticompetitive means of restricting budget-conscious plans that would replicate the effects of its plan restrictions;

d.    enjoin NYP from retaliating, or threatening to retaliate, against any insurer for offering, or attempting to offer, budget-conscious plans; and

e.    award Plaintiff its costs in this action and such other relief as the Court may deem just and proper.

**Answer:** This paragraph does not contain any factual allegations, and as such, no response is required. To the extent a response is required, NYP denies that it is liable and denies that Plaintiff is entitled to any relief.

**AFFIRMATIVE DEFENSES**

NYP asserts the following affirmative defenses.  In doing so, NYP does not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places the burden upon Plaintiff.

### *First Affirmative Defense*
### *(Core Economic Activity)*

1.     NYP incorporates by reference each and every response, denial, and allegation set forth in its Answer, as though fully set forth and re-alleged in this section.

2.     The challenged contractual provisions are not unreasonable restraints of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1, because they reflect the core economic activity of the managed care agreements between NYP and commercial insurers for the provision of healthcare services to the insurers' members.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 6-8 (2006).

3.     In any contract for the sale of services, prices and quantity are material terms the absence of which renders the contract void for want of consideration.  The managed care agreements at issue here are no different.  The challenged provisions reflect the volume commitments – in the form of network placement commitments –insurers make through plan design in exchange for rate concessions.  They are an integral part of the managed care bargain.

4.     Insurers make network placement commitments instead of making specific volume commitments because insurers do not directly control patient volume.  They do not control when a patient gets sick or suffers an injury.  They also do not know in advance of contracting how many covered lives they will need to contract for.  Contracting for specific volume levels, therefore, would be an illusory agreement without volume guarantees, which would require insurers to assume the risk of making those financial guarantees.

55

5. Rather than contract over volume they do not directly control, insurers contract over actions they do control: the placement within the networks they design. These network placement provisions determine, indirectly, and with a reasonable degree of certainty, the amount of volume an insurer is capable of delivering to the provider and constitute legally binding consideration for any rate concession offered by the provider.

6. The challenged network placement provisions *define* the services for which the insurer is contractually obligated to make payment. Insurers' plan benefits design determines the coverage obligations insurers have for their enrollees' healthcare expenses, which often depends on the network placement of the provider. By designating a provider as "in-network," the insurer is both *simultaneously* creating contractual obligations *to the enrollee* and triggering reimbursement obligations *to the provider*. The challenged network placement provisions also contractually obligate providers to provide care to the insurers' covered patients at the agreed-upon discounted rates. These provisions are, therefore, inseparable from the contract.

7. Without the challenged provisions, insurers offer nothing of value to providers in exchange for rate concessions. Insurers' obligations to cover their members' care are owed under separate insurance contracts with patients and employers, not providers. Patients, in the absence of any further agreement with providers, would be obligated to pay providers' higher billed charges, as adjusted by applicable regulations. An insurer seeking to lower its financial obligations from this pre-existing set of contractual obligations – through additional rate concessions – must offer consideration in return. The challenged network placement provisions are that consideration.

8. The challenged provisions are not separable from the rate terms they support. They cannot be modified or eliminated without changing the anticipated volume of services under contract, and without dissolving the consideration that supports the rate concessions on the other

side of the bargain. As such, they are core economic terms of the managed care bargain, not restraints attached to it.

9. The challenged provisions are not "restraints" – ancillary or otherwise – because they are not exclusionary and do not prevent insurers from contracting with other providers. An agreement to buy a product is not a "restraint" even if it means that the purchaser no longer needs to buy the same product from someone else. For the same reason, an agreement to place a provider in an insurers' network is not a "restraint" of trade, but the *existence* of trade itself. Negotiation over such placement is "core activity" of both the provider, including NYP, and the insurer.

10. The plaintiffs' claims are therefore barred in whole or in part.

### Second Affirmative Defense
### (Reasonable Ancillary Restraints)

11. NYP incorporates by reference each and every response, denial, and allegation set forth in its Answer, as though fully set forth and re-alleged in this section.

12. Even if the challenged contractual provisions were considered "restraints," they do not violate Section 1 of the Sherman Act, 15 U.S.C. § 1, because they are reasonably ancillary to legitimate and procompetitive transactions for the provision of healthcare services to insurers' members.

13. Agreements for the provision and reimbursement of healthcare services to insurers' members are legitimate and procompetitive commercial transactions. The transaction secures for insurers the ability to have their members treated at specified, agreed-upon rates. This enhances predictability, reduces potential for legal disputes over payment, provides discounts from billed charges or otherwise applicable costs, and ensures member access to a comprehensive range of services. The transaction also secures for patients seamless access to high quality care, streamlined billing, and reduced costs.

14.     Network placement provisions – including the challenged contractual provisions – are subordinate to the transaction for the provision of healthcare services to insurers' members. Network placement provisions define the class of patients that are the subject of the overall provider healthcare services contract.  These provisions further determine the volume of patients that providers can reasonably expect to treat under that contract, which is integral to the ability of providers, like NYP, to set appropriate rates.

15.     The challenged provisions are reasonably necessary to achieve the legitimate and procompetitive purposes of the overall healthcare transaction.  Without these provisions, insurers would deliver different or lower levels of volume under the contract, which would undermine the economic basis on which rates were negotiated and would undermine the benefit of the bargain.

16.     There are no less restrictive alternatives that could achieve the legitimate and procompetitive purposes of the overall healthcare services contract.  Contracts without network placement provisions do not contain necessary volume commitments, which are material terms in the contract, or indeed, any contract for the provision of services.

17.     Nor can the network placement provisions be replaced or supplanted with specific volume commitments, market share requirements, or other proxies for network placement.  Such provisions either are economically equivalent to the challenged provisions, undermine the basis on which volume-based rates were negotiated, or require insurers to incur unacceptable financial risk for conduct and circumstances beyond their control.

18.     Network placement provisions that do not permit NYP to contract to be an in-network provider for all the plans an insurer offers is not a less restrictive alternative because it eliminates competition from NYP for the excluded plans, reduces volume under the contract, and deprives the insurer of the rate concessions associated with such volume.

19.     The plaintiffs' claims are therefore barred in whole or in part.

### Third Affirmative Defense
### (Procompetitive Justifications)

20.     NYP incorporates by reference each and every response, denial, and allegation set forth in its Answer, as though fully set forth and re-alleged in this section.

21.     The challenged contractual provisions do not violate Section 1 of the Sherman Act, 15 U.S.C. § 1, because they achieve significant procompetitive benefits that outweigh any alleged anticompetitive effects.

22.     The challenged provisions enable NYP to compete against other providers on a non-discriminatory and non-exclusionary basis for inclusion in insurers' networks.  Competition for increased market share is a procompetitive justification.  Because the challenged provisions do not exclude any provider from gaining access to patients as an in-network provider, the procompetitive benefits of the challenged provisions outweigh any alleged anticompetitive effects.

23.     The challenged provisions expand output and reduce costs by providing NYP with access to patients, which are necessary to cover NYP's high costs of care, including the high fixed costs required to operate one of the world's premium healthcare systems.  Consumers benefit when NYP can cover its fixed costs because it enables NYP to lower its rates and improve quality. Because the challenged provisions do not prevent any competitors from competing to gain patients as an in-network provider, the procompetitive benefits of the challenged provisions outweigh any alleged anticompetitive effects.

24.     The challenged provisions provide patients with access to greater choice and more competitive options for healthcare.  To the extent the challenged provisions are considered "restraints," they only restrain insurers from imposing discriminatory penalties, incentives, or other restrictions on members to strip them of their choice to use their preferred provider.  When

59

insurers discriminate against providers, such as NYP, they eliminate or significantly hamper stage two competition among providers.  By preventing such discrimination, the challenged provisions preserve access to NYP and facilitate stage two competition.  In stage two, NYP can compete with other in-network providers across price and non-price dimensions.  Because the challenged provisions do not require insurers to favor NYP over any other provider, the procompetitive benefits of the challenged provisions outweigh any alleged anticompetitive effects.

25.    The challenged provisions expand output and preserve quality by ensuring that all insured patients have access to high quality providers at affordable rates.  The commercial healthcare insurance market in the alleged relevant markets is concentrated among a small number of insurers that exercise substantial monopsony power, and – according to the DOJ – would use that power to assemble Restricted Choice Networks composed of providers that would accept rates so low that investment in facilities, equipment, and personnel is compromised.  Members – who in many cases may not have been provided with a meaningful choice of health plans – cannot reasonably or readily switch and are, instead, channeled into those reduced-quality networks.  The challenged provisions ensure that those members retain access to NYP's higher-quality care. Because the challenged provisions do not prevent any insurer from continuing to offer its members access to the same providers that would otherwise comprise the Restricted Choice Network, the procompetitive benefits of the challenged provisions outweigh any alleged anticompetitive effects.

26.    There are no less restrictive means to achieve the procompetitive benefits of the challenged provisions. Any alternatives – including partial-network arrangements, *ex post* steering restrictions, and specific volume commitments – either are economically equivalent to the challenged provisions, fail to provide the volume certainty necessary to support *ex ante* rate

concessions, impose unacceptable financial risk on insurers for conduct beyond their control, or eliminate competition between NYP and the favored providers.

27.     The plaintiffs' claims are therefore barred in whole or in part.

## PRAYER FOR RELIEF

The New York and Presbyterian Hospital requests that the Action be dismissed and that Judgment be entered in its favor.

Dated: May 26, 2026

/s/ *Colin R. Kass*

Colin R. Kass*
Mark R. Rosman
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6800
ckass@proskauer.com
mrosman@proskauer.com

Vinay Kohli*
Richard W. Westling*
Portia S. Proctor
PROSKAUER ROSE LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 557-2900
vkohli@proskauer.com
rwestling@proskauer.com
pproctor@proskauer.com

David A. Munkittrick
Reut N. Samuels
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com
rsamuels@proskauer.com

*Attorneys for Defendant The New York and Presbyterian Hospital*

* *Admitted Pro Hac Vice*