# EXHIBIT 1

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of New York

| United States of America | ) |
|---|---|
| *Plaintiff* | ) |
| v. | ) |
| The New York and Presbyterian Hospital | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.   26-cv-02480

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Aetna  Inc. c/o CT Corporation System
67 Burnside Ave., East Hartford, CT 06108

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: 151 Farmington Ave.<br>Hartford, CT 06156 | Date and Time:<br>06/19/2026 11:59 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      06/05/2026

*CLERK OF COURT*

OR

_____          /s/ Vinay Kohli
   *Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*     Defendant
The New York and Presbyterian Hospital                                    , who issues or requests this subpoena, are:

Vinay Kohli, 2029 Century Park East, Suite 2400, Los Angeles, CA 90076, vkohli@proskauer.com, 310-284-5695

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  26-cv-02480

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Plaintiff,

v.

THE NEW YORK AND PRESBYTERIAN HOSPITAL,

Defendant.

1:26-cv-02480

Hon. Paul A. Engelmayer, USDJ
Hon. Ona T. Wang, USMJ

**EXHIBIT A**

**I.    SUBPOENA SPECIFICATIONS**

**A.    *Documents Relating to Your Organizational Structure and Relevant Employees.***

1.    *Corporate Structure*.  Documents sufficient to identify your corporate structure, including all direct and indirect parents, subsidiaries, and affiliates, and to show the business purposes and activities of each. For purposes of this request, "affiliate" means any entity in which you hold a 20% or greater ownership interest, a board seat, a general-partner interest, or an LLC membership interest, and includes any entity through which you do business in the relevant area.

2.    *Relevant Personnel*.  Organizational charts and documents sufficient to identify your (i) officers; (ii) directors; (iii) all employees responsible for provider contracting, network design, plan benefit design, competitive analyses, or financial analysis for each year during the relevant period; and (iv) all proposed custodians, their direct superior, and their direct reports.

**B.    *Documents Relating to Your Health Plans and Networks.***

3.    *Health Plans Offered*.  Documents sufficient to identify each health plan you have offered, sold, marketed, or considered offering in the relevant area during the relevant period, including for each: (i) the network composition (including all in-network and out-of-network providers); (ii) the tiering structure, if any; (iii) the plan benefit design (including deductibles, copays, coinsurance, out-of-pocket maximums, and any site-of-service or designated-provider incentives); (iv) the premiums, capitation rates, or other payments received from employers, members, government payors, or others; (v) enrollment and member counts by year during the relevant period.

4.    *Your Provider Networks*.  Documents sufficient to identify each provider network you have created, operated, or used in connection with any health plan in the relevant area during the

1

relevant period, including for each: (i) the network name and identifier; (ii) the geographic scope; (iii) the included providers (and any tiered or designated-provider designations); (iv) the dates the network was operational; and (v) the health plans that used the network.

### C.    *Documents Relating to Steering, Anti-Steering, or Network Placement Provisions.*

5.    *Provider Placement Decisions*.  All documents relating to any decision to designate a hospital provider in the relevant area as an in-network provider, out-of-network provider, preferred provider, or non-preferred provider.

6.    *Network Design Documents*.  All documents relating to network design, including the effects of network design on reimbursement rates, plan benefits, and health plan features.

7.    *Steering*.  All documents relating to steering, network placement provisions, or plan benefit designs to influence or affect the hospital providers patients use for care.

8.    *Contracting and Steering Strategy Documents*.  All documents relating to any competitive or business strategy concerning hospital provider contracting, network placement, steering, anti-steering provisions, or leakage.

9.    *The All Products Provision*.  All documents regardless of date relating to the origin, drafting, negotiation or modification of any All Products provision in any contract with any provider, including hospital and non-hospital providers.

10.    *Network Placement or Volume Discounts*.  All documents relating to any actual or proposed reimbursement rates, rate concessions, discounts, or other consideration offered or received in exchange for volume, network placement, steering, or plan benefit provision or commitment.

11.    *Other Relevant Contract Provisions*.  All documents relating to the use or consideration of contract-term-length, termination, liquidated-damages, volume guarantees, make-whole, or non-renewal provisions as a substitute for, or complement to, any network placement, steering, or anti-steering provision.

12.    *Contracting Policies, Playbooks, and Models*.  All policies, practices, procedures, contracting manuals, playbooks, model contract language, or redline libraries addressing provider contracting practices, steering, All Products provisions, or network placement provisions.

13.    *Contract Harmonization*.  All documents relating to any effort to standardize, harmonize, or maintain consistency across your provider contracts in the relevant area with respect to network placement, steering, anti-steering, or All Products provisions.

14.    *Cross-Provider Contracting Spillover*.  All documents relating to how changes to a hospital provider contract (including any network placement, steering, All Products, or rate provision) may affect your contracts, negotiations, or network design with any other hospital provider in the relevant area.

15.    *Provider Volume Effects*.  All documents relating to the effect on hospital providers in the relevant area of volume, network placement decisions, steering, network exclusion, or contract termination or non-renewal, including effects on provider economics, profits, finances, unit costs, capacity utilization, scale economies, recovery of fixed or incremental costs, or willingness to offer rate concessions or volume-based discounts.

16.    *Allocation of Provider Volume*.  All documents relating to the share, allocation, or distribution of patient volume, utilization, or spending in the relevant area among providers in or out of any network, including any analysis of how network design, network placement provisions, plan benefit design, or steering may affect such shares.

17.    *Provider Network Complaints*.  All documents relating to any complaint, objection, or concern raised by any employer, plan sponsor, union, or regulator regarding network design, network placement provisions, steering, or the availability of limited networks or plans in the relevant area.

### D.    *Documents Relating to the Interplay between Plan Benefits, Network Design, Provider Volume, and Member or Customer Demand or Satisfaction.*

18.    *Network Design Membership Effects*.  All documents relating to the effect of network design or steering on competition for health plan members and customers, including (i) any tradeoffs between broad and limited provider networks or plans, or (ii) the effects of network design or steering on your market share, member enrollment, retention, or satisfaction.

19.    *Members' Network Preferences*.  All documents relating to health plan member or customer preferences concerning provider network breadth, provider selection, limited provider networks or plans or budget conscious plans, or steerage, including any responsive market research, surveys, or focus groups.

20.    *Steering Efficacy*.  All documents relating to the effects, effectiveness, leakage, or limits of plan benefit design or network design on patient steering, provider selection, or shifts in patient volume among providers.

21.    *Plan Benefits Features and Tradeoffs*.  All documents relating to or comparing the advantages, disadvantages, or tradeoffs between any plan benefit design features, including any responsive analyses of deductibles, copays, coinsurance, out-of-pocket maximums, policy limits, exclusions, prior authorization or approval requirements, or other network design attributes.

### E.    *Documents Relating to Designated-Provider Programs.*

22.    *DPPs*.  All documents relating to the design or operation of any Designated-Provider Program, including any analysis for cost, rates, volume, quality, or other criteria used to designate a provider for inclusion in the program.

23.    *DPP Steering*. All documents relating to the use or potential effect of any Designated-Provider Programs to steer patients, shift volume among providers, or reduce costs or rates,

3

including any analysis of cost savings, rate differentials, steerage, or volume effects relating to such programs.

24.    ***Non-Quality-Based DPP Exclusions***.  All documents relating to the exclusion, down-grade, or de-designation of any provider in the relevant area from a Designated-Provider Program for any reason other than quality of care or patient outcomes.

### F.    *Documents Relating to Insurer or Provider Bundling or Cross-Subsidization Across Health Plans, Services, or Facilities.*

25.    ***Bundling Benefits***.  All documents relating to bundled or multi-product or service contracting with providers, or bundled or multi-product offerings across your own plans, products, or lines of business, including responsive documents discussing (i) the advantages or disadvantages of bundled or multi-service, facility, or plan contracting (ii) the use of such bundling to reduce costs, spread fixed costs, enable cross-subsidization, support integrated delivery, facilitate efficient contracting, or otherwise create value.

26.    ***Bundling Bargaining Power***.  All documents relating to bundled or multi-product or service contracting with providers, or bundled or multi-product offerings across your own plans, products, or lines of business, to obtain, preserve, or enhance bargaining leverage or favorable contracting terms with any provider.

### G.    *Stage One and Stage Two Price Competition.*

27.    ***Two Stage Competition Documents***.  All documents relating to your understanding of, analysis of, or strategy concerning the two-stage structure of competition in healthcare, including (i) competition among providers for inclusion in or favorable placement within a network, network tier, or designated-provider program (stage one competition); and (ii) competition among in-network providers for patient volume at the point of care (stage two competition).

28.    ***Stage Two Price Competition***.  All documents relating to price competition among in-network providers or providers within the same network tier, including (i) the existence of price competition for members among such providers; (ii) your efforts to encourage price competition among such providers.

29.    ***The Effect of Plan Benefits on Stage Two Price Competition.***  All documents relating to the effect of any plan benefit feature on price competition among providers or member price-sensitivity in the selection of providers, including (i) whether the feature encourages or discourages such provider price competition or member price sensitivity; (ii) your efforts to utilize or select plan benefits that maximize or maintain provider price competition or member price sensitivity; (iii) whether the feature constitutes an incentive or a penalty, or is discriminatory; (iv) any analysis of whether the feature is proportional to, or cost-justified based on, provider cost differentials; (v) whether the feature encourages or discourages care; and (vi) any trade-offs between encouraging price sensitivity and encouraging or discouraging care.

4

### H.    *Documents Relating to Your Contractual Relationship with NYP*

30.    *NYP Agreements*.  All contracts, agreements, and understandings, regardless of date, between you and NYP, including amendments, exhibits, schedules, side letters, term sheets, binding or non-binding letters of intent, and written memorializations (including emails) of oral understandings.

31.    *NYP Negotiations*.  All documents, regardless of date, relating to contractual negotiations between you and NYP, including (i) responsive communications with NYP; (ii) responsive internal analyses and assessments; (iii) any responsive pre-negotiation strategy materials, negotiation playbooks, BATNA or walk-away analyses, and post-negotiation debriefs; and (iv) responsive drafts, redlines, term sheets, and proposals.

32.    *NYP Contract Disputes*.  All documents relating to any contractual disputes with NYP, including any disagreements concerning the interpretation or meaning of, or compliance with, any provision.  This request excludes disputes over specific individual claims, except to the extent it relates to disputes concerning network participation or coverage as an in-network provider.

33.    *NYP Network Participation*.  All documents relating to NYP's actual or potential inclusion or placement in any network, network tier, limited provider network or plan, or designated-provider program, including (i) any communications with NYP; (ii) any communications with any third party; and (iii) internal analyses, assessments, or planning documents.

34.    *NYP Network Exclusion*.  All documents relating to the NYP's actual or potential exclusion or demotion from any network, network tier, limited provider network or plan, or designated-provider program, including (i) consideration of whether to exclude or demote NYP; (ii) the effects of any actual or potential exclusion or demotion on you, your health plan members or customers, or other providers; (iii) any contingency or preparation planning concerning such exclusion or demotion; and (iv) all actual or draft communications with health plan members or customers, other providers, regulators, or the public concerning such exclusion or demotion.

35.    *NYP Rate Analysis*.  All documents analyzing NYP, or comparing NYP to other providers, with respect to rates, total cost of care, volume, market share, profits, margins, medical loss ratios, member enrollment, retention, or satisfaction; premiums, or health plan costs or prices.

36.    *NYP Quality Analysis*.  All documents relating to NYP's quality, reputation, or other non-price attributes, including any analysis of how those attributes affect health plan member or customer demand or satisfaction.

37.    *Contracting Personnel Communications*.  All documents relating to communications between you, on the one hand, and Dov Schwartzben, Bill Gold, Steve Corwin, Brian Donnely, Lauren Marino, or Avraham  Munk, on the other, including responsive (i) text messages; (ii) written memorializations of any communications; and (iii) any talking points or outlines relating to actual or planned discussions.

### I. *Documents Relating to Your Contractual Relationship with Competing Providers.*

38. *Competing Provider Agreements*.  All contracts, agreements, and understandings, regardless of date, between you and any competing providers, including amendments, exhibits, schedules, side letters, term sheets, binding or non-binding letters of intent, and written memorializations (including emails) of oral understandings.

39. *Competing Provider Negotiations*.  All documents, regardless of date, relating to contractual negotiations between you and competing providers, including (i) responsive communications with such providers; (ii) internal analyses and assessments; (iii) any responsive pre-negotiation strategy materials, negotiation playbooks, BATNA or walk-away analyses, and post-negotiation debriefs; and (iv) responsive drafts, redlines, term sheets, and proposals.

40. *Competing Provider Network Inclusion or Exclusion*.  All documents relating to any competing provider's inclusion, exclusion, or placement in any network, network tier, limited provider network or plan, or designated-provider program, including (i) any responsive communications with such providers; (ii) any responsive communications with any third party; and (iii) responsive internal analyses, assessments, or planning documents.

41. *Competing Provider NYP Communications*.  All documents relating to any communications with any competing provider referencing or concerning NYP.

### J. *Documents Relating to Your Consideration of any Limited Provider Network or Plan.*

42. *LPNPs*.  All documents relating to the creation, development, consideration, discontinuation, rejection, or modification of any limited provider network or plan in the relevant area, including (i) any communications with providers; (ii) any communications with health plan members or customers; (iii) any internal analyses, strategic planning documents, or competitive assessments; (iv) any customer surveys, studies, or focus groups; and (v) any financial models, budgets, or projections.

43. *LPNP Effects*.  All documents relating to any actual or potential effects of any limited provider network plan on (i) enrollment, including cannibalization of other plans; (ii) rates, cost of care, medical loss ratios, profits, or margins; (iii) volume, share, or negotiation leverage with respect to included or excluded providers; (iv) premiums, pricing, or competitive position relative to your other plans or plans by other insurers or payors; (v) member utilization or satisfaction.

### K. *Documents Relating to Insurer Bargaining and Competitive Position.*

44. *Insurer Competition*.  All documents relating to competition with other insurers, including documents relating to (i) the identity and competitive significance of any of your competitors; (ii) market shares or market concentration in any market or market segment in the relevant area; (iii) market power; (iv) competition for health plan members or

customers; (v) competition for providers; (vi) competitive strategies; and (vii) comparisons, including strengths or weakness, between you and any competitor.

45.    *Competitive Bidding*.  All documents relating to your competitive bidding or competitive performance in the sale of health plans in the relevant area, including (i) win/loss reports, trackers, post-mortems, or analyses; and (ii) the identity of each customer or prospect, the date of the bid or competitive engagement, the products considered, the outcome, the competing health plans involved, and the stated or inferred reasons for the outcome.

46.    *Single and Two-Sided Network Effects*.  All documents relating to existence, operation, magnitude, or competitive significance of network effects, scale advantages, feedback loops, flywheels, or two-sided market dynamics, including any documents concerning (i) the relationship between membership volume and the ability to attract providers or negotiate more favorable rates; (ii) the relationship between provider network breadth or make-up and the ability to attract health plan members or customers; or (iii) how changes affecting providers may directly or indirectly impact members, or vice versa.

47.    *Insurer Bargaining Strengths, Power, and Leverage*.   All documents relating to bargaining or negotiating strengths, power, or leverage vis-à-vis any provider, including any assessment of your status as a "must-have," "essential," or otherwise significant payor; any assessment of a provider's ability or willingness to terminate, go out-of-network, or operate without your network; and any assessment of the share of a provider's patient volume, revenue, or commercial revenue attributable to you.

48.    *Buyside Market Power*.  All documents relating to any allegation, assertion, or statement that you or any other insurer in the relevant area or nationally, individually or collectively, possess large or dominant market shares, market power, monopoly power, monopsony power, bargaining leverage, or negotiation leverage.

### L.    *Documents Relating to Reimbursement Rates*

49.    *Rate Modeling and Analyses*.  All documents relating to your rate setting, rate modeling, rate benchmarking, rate analysis, or rate comparisons with respect to NYP or any competing provider.

50.    *Rate Strategies*.  All documents relating to your strategies, plans, or considerations for reducing, controlling, or limiting your medical loss ratio, total cost of care, or unit prices paid to providers.

51.    *Rate Financial Effects*.  All documents relating to the impact of NYP's or any competing provider's rates on health plan premiums, medical loss ratios, margins, profits, or rate filings for any service line or line of business.

52.    *Rate Pass-Through*.  All documents relating to your retention, capture, pass-through, or sharing of any savings achieved from lower provider rates or steering, including documents showing how such savings are allocated among you and your health plan members or customers.

### M.    Financial Data and Information

53.    *Financial Statements*.  All audited and unaudited financial statements, annual reports, 10-K and 10-Q filings, statutory financial filings, investor presentations, earnings call transcripts, analyst day presentations, rating agency communications, or bond offering materials relating to NYP; provider contracting; profits and losses; cost of care; competition nationally or in the relevant area; plan design; network design; steering; or provider rates, medical loss ratios, premiums, enrollment, retention, or market share for any health plan offered in the relevant area.

54.    *Board Materials*.  All board or board committee materials or minutes relating to NYP; provider contracting; profits and losses; cost of care; competition nationally or in the relevant area; plan design; network design; steering; or provider rates, medical loss ratios, premiums, enrollment, retention, or market share for any health plan offered in the relevant area.

55.    *Regularly Prepared Reports*.  All regularly prepared monthly, quarterly, and annual management financial reports discussing NYP; provider contracting; profits and losses; cost of care; competition nationally or in the relevant area; plan design; network design; steering; or provider rates, medical loss ratios, premiums, enrollment, retention, or market share for any health plan offered in the relevant area.

### N.    Geographic Markets.

56.    *Health Plan Geographic Markets*.  All documents relating to the geographic area in which you compete for the sale of health plans, including (i) any analysis of member residence, employer location, or the geographic distribution of covered lives; (ii) any analysis of where you do or could compete for members, customers, employers, plan sponsors, or unions; (iii) any geographic definition used in rate filings, regulatory submissions, or competitive assessments; and (iv) any analysis of geographic barriers to entry or expansion.

57.    *Competing Provider Geographic Markets*.  All documents relating to the geographic areas in which any competing provider competes, including (i) any analysis of patient origin, patient flow, catchment areas, or hospital service areas; (ii) any analysis of where members travel or could travel to receive healthcare services; and (iii) any diversion, substitution, or closest-substitute analysis with respect to any healthcare provider.

58.    *Network Adequacy Assessments*.  All documents relating to network adequacy with respect to any health plan, product, or network offered in the relevant area, including (i) network adequacy filings and submissions to any regulator; (ii) internal assessments of network adequacy compliance, including time-and-distance, appointment-availability, and provider-to-member-ratio analyses; (iii) gap analyses, remediation plans, or waiver or variance requests; (iv) the role of any healthcare provider, including NYP, in meeting network adequacy standards; and (v) the network adequacy implications of any actual or potential network change, including the addition, exclusion, demotion, or termination of any provider.

### O.    *Marketing Materials re Network Design or Premiums.*

59.    *Marketing Materials*.   All marketing, promotional, advertising, and sales materials concerning any health plan or product offered in the relevant area, including materials describing or promoting (i) provider network breadth, choice, or access; (ii) any specific healthcare provider, including NYP; (iii) any limited provider network, narrow network, HMO, or similar product; (iv) any designated-provider program; or (v) cost, premium, or out-of-pocket savings associated with network design.

60.    *Member and Customer Network Communications*.  All communications with health plan members or customers in the relevant area concerning network composition, inclusion or exclusion of any healthcare provider, network changes, steering, or designated-provider programs.

61.    *Network Messaging Strategies*.  All documents relating to your messaging strategy, brand positioning, member research, customer research, focus groups, or surveys concerning provider networks, network breadth, provider choice, access to specific providers, or the value of broad or limited networks.

### P.    *Structured Data*

62.    *Database Identification*.  Documents sufficient to identify and describe each structured data system you maintain that contains information relating to members, providers, claims, contracts, networks, plans, products, rates, enrollment, utilization, or financial performance, including for each such system (i) its name, purpose, and data dictionary or schema; (ii) the time period for which data is accessible; (iii) the identity or name of each field in the database; and (iv) the identity of any standard reports or extracts regularly produced from it.

63.    *Rate Data*.   Structured data sufficient to show, on at least a year-by-year basis, the reimbursement rates, fee schedules, discounts off billed charges, case rates, per diems, DRG payments, capitated payments, value-based payments, quality incentive payments, and any other financial terms applicable to NYP or any competing provider, separately for each plan, product, line of business, and category of service.

64.    *Volume Data*.  Structured data sufficient to show, for the relevant period, the number of inpatient admissions, outpatient encounters, ambulatory surgeries, and emergency department visits at NYP and each competing provider in the relevant area, disaggregated by member three-digit zip code or county of residence, facility, MS-DRG or service line, plan, product, line of business, and calendar quarter.

65.    *Provider Payment Data*.  Structured data sufficient to show, for the relevant period, the total billed and paid amounts at NYP and each competing provider in the relevant area, disaggregated by facility, MS-DRG or service line, plan, product, line of business, and calendar quarter.

66.    *Health plan Financial Data*.  Structured data sufficient to show, on a year-by-year basis for the relevant period, separately for each line of business (including fully insured, ASO,

9

individual, small group, large group, exchange, Medicare Advantage, Medicaid Managed Care) and separately for each health plan and product offered in the relevant area: (i) premiums; (ii) medical loss ratio; (iii) enrollment; (iv) retention; (v) market share; (vi) revenue; (vii) administrative expenses; (viii) underwriting gain or loss; (ix) the total amount you paid to NYP and to each competing provider; (x) the total revenue derived from members who used the services of NYP and each competing provider; and (xi) any equivalent metric you track.

### Q.    *Documents Relating to the DOJ's Investigation*

67.    *DOJ Investigation Materials*.  All documents relating to the Department of Justice ("DOJ") investigation or lawsuit concerning NYP's contracting practices, including (i) all related documents produced to or received from the DOJ; (ii) all related communications with the DOJ; (iii) all non-privileged internal analyses or discussions; and (iv) all related communications with any third-party.

68.    *Government Lobbying Materials*.  All documents relating to any communications with any government agency or official (other than the DOJ) about NYP's contracting practices.

### R.    *Documents Relating to Steering or Anti-Steering Investigations or Lawsuits.*

69.    *Atrium*.  All documents relating to any investigation or lawsuit relating to *Atrium Health* (*U.S. v. The Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas HealthCare System*, 3:16-cv-00311 (W.D.N.C.)), including (i) all documents you produced or testimony you provided to any party; (ii) all communications with any party; (iii) any non-privileged internal analyses or discussions; (iv) any communications with any third party; and (v) any analysis of the effect of any remedy or judgment in that matter, including any effect on market shares, reimbursement rates, or availability of limited provider networks or plans.

70.    *Sutter Health*.  All documents relating to any investigation or lawsuit relating to *Sutter Health* (*UFCW & Employers Benefit Trust v. Sutter Health*, CGC-14-538451 (Cal. Super. Ct. S.F. Cnty.); *California v. Sutter Health*, CGC-18-565398 (Cal. Super. Ct. S.F. Cnty.); and *Sidibe v. Sutter Health*, 3:12-cv-04854 (N.D. Cal.), 104 F.4th 1043 (9th Cir. 2024)), including (i) all documents you produced or testimony you provided to any party; (ii) all communications with any party; (iii) any non-privileged internal analyses or discussions; (iv) any communications with any third party; and (v) any analysis of the effect of any remedy or judgment in that matter, including any effect on market shares, reimbursement rates, or availability of limited provider networks or plans.

### S.    *Documents Relating to Any Antitrust Investigation Concerning Insurer Market Power or Bargaining Power.*

71.    *U.S. v. Aetna*.  All documents concerning insurer or payor buy-side market power, monopsony, bargaining or negotiation leverage, network effects, payor concentration, the all products clause, or steering in connection with *U.S. v. Aetna Inc.*, No. 3:99-cv-1398 (N.D. Tex.), including (i) all documents you produced or testimony you provided to any party, including any materials you produced under the Hart-Scott-Rodino Act; (ii) all

communications with any party; (iii) any non-privileged internal analyses or discussions; and (iv) any communications with any third party.

72.    *U.S. v. Anthem*.   All documents concerning insurer or payor buy-side market power, monopsony, bargaining or negotiation leverage, network effects, payor concentration, or steering in connection with *U.S. v. Anthem, Inc.*, 1:16-cv-1493 (D.D.C.), including (i) all documents you produced or testimony you provided to any party, including any materials you produced under the Hart-Scott-Rodino Act; (ii) all communications with any party; (iii) any non-privileged internal analyses or discussions; and (iv) any communications with any third party.

73.    *U.S. v. BCBS of Michigan*.   All documents concerning insurer or payor buy-side market power, monopsony, bargaining or negotiation leverage, network effects, payor concentration, or steering in connection with *U.S. v. Blue Cross Blue Shield of Michigan*, 2:10-cv-14155 (E.D. Mich.), including (i) all documents you produced or testimony you provided to any party, including any materials you produced under the Hart-Scott-Rodino Act; (ii) all communications with any party; (iii) any non-privileged internal analyses or discussions; and (iv) any communications with any third party.

### T.    *Documents Relating to Specific Competitive Episodes*

74.    *32BJ*.   All documents relating to any communication with 32BJ Health Plan concerning NYP's contracting practices or NYP's participation, inclusion, or exclusion from any network, tier, or limited provider network or plan covering 32BJ members.

75.    *City of New York*.   All documents relating to any communication with the City of New York concerning NYP's contracting practices or NYP's participation, inclusion, or exclusion from any network, tier, or limited provider network or plan covering City of New York employees.

## II.    DEFINITIONS

1.    "Relevant period" means the period from January 1, 2021 through the present.

2.    "Relevant area" means the New York-Newark-Jersey City, NY-NJ Metropolitan Statistical Area; Fairfield County, Connecticut; New Haven County, Connecticut; and any portion or subdivision thereof.

3.    "NYP" means The New York and Presbyterian Hospital, and includes its officers, directors, employees, partners, corporate parent, subsidiaries, and affiliates.

4.    "You" or "your" refers to the entity to which this Subpoena is directed, including its officers, directors, employees, partners, corporate parent, subsidiaries, and affiliates.

5.    "Insurer" means (i) Emblem, including EmblemHealth, Inc., GHI Health Plan, and HIP Health Plan of New York; (ii) Aetna, including Aetna Inc., Aetna Health and Life Insurance Co., Aetna Health Insurance Co. of New York,  Aetna Health Inc., and CVS Health Corporation; (iii) Cigna, including The Cigna Group, Connecticut General Life Insurance Co., and Cigna Health and Life Insurance Company; (iv) Anthem, including Elevance Health, Inc., , Anthem HealthChoice Assurance, Anthem HealthChoice HMO Inc., and Anthem Health Plans Inc.; (v) United, including UnitedHealth Group Incorporated, UnitedHealthcare Insurance Company of New York, UnitedHealthcare of New England, Inc., Oxford Health Plans, and Oxford Health Plans (CT), Inc.; (vi) Horizon, including Horizon Healthcare Services, Inc., Horizon Blue Cross Blue Shield of New Jersey, and Horizon NJ Health; (vii) the parents, subsidiaries, and affiliates of any of the foregoing to the extent engaged directly or indirectly in the provision or administration of health benefits; and (viii) any other person engaged in the provision or administration of health benefits in the relevant area, but excluding employers, unions, and other health plan customers.

6.    "Health plan" means any health insurance plan, health benefit plan, or health-benefit product providing coverage for medical services, including commercial group plans (whether fully insured, self-funded, or administered on an administrative-services-only basis), individual and small-group plans, exchange plans, Medicare Advantage plans, Medicaid managed care plans, dual-eligible plans, FEHB plans, and TRICARE plans.

7.    "Health plan members" or "members" means any person enrolled in or covered by a health plan, including subscribers, dependents, and beneficiaries.

8.    "Health plan customers" or "customers" means any employer, union, trust fund, governmental entity, or other group purchaser that contracts with an insurer for the provision or administration of health benefits.

9.    "Provider" means any person delivering healthcare services, including hospitals, physicians, physician groups, ambulatory surgery centers, behavioral health providers, ancillary providers, and other licensed clinicians.

12

10.    "Hospital provider" means any provider that operates one or more general acute-care hospitals, together with all of its affiliated providers, physician groups, and facilities, including outpatient, ambulatory, professional, ancillary, and post-acute services.

11.    "Non-hospital provider" means any provider that is not a hospital provider, including independent physicians and physician groups, ambulatory surgery centers, and other outpatient and ancillary providers that are not affiliated with a hospital provider.

12.    "Academic medical center" or "AMC" means a hospital provider affiliated with an accredited medical school and conducting graduate medical education through residency or fellowship programs.

13.    "Competing academic medical center" or "competing AMC" means (i) Mount Sinai; (ii) NYU Langone; (iii) Montefiore; (iv) Memorial Sloan Kettering; (v) Yale New Haven; and (vi) any other AMC operating in the relevant area.

14.    "Competing health system" means (i) Northwell Health; (ii) Hackensack Meridian Health; (iii) RWJBarnabas Health; (iv) Atlantic Health System; (v) NYC Health + Hospitals; and (vi) any other multi-hospital health system operating in the relevant area.

15.    "Competing regional hospital provider" means any hospital provider operating in the relevant area.

16.    "Competing national hospital provider" means a hospital provider that draws patients nationally, including Cleveland Clinic, Mayo Clinic, Mass General Brigham, Johns Hopkins, UCLA Health, UCSF Health, Penn Medicine, Cedars-Sinai, Northwestern Memorial, Stanford Health Care, Duke, and any other hospital provider ranked among the top 25 by U.S. News & World Report during the relevant period.

17.    "Competing provider" means any competing AMC, competing health system, competing regional hospital provider, or competing national hospital provider.

18.    "Reimbursement rate" or "rate" means any amount, methodology, or structure for compensating a provider for any healthcare service, including (i) any contracted, negotiated, or stated rate, fee, charge, allowance, or payment, whether expressed as a fee schedule, percent of billed charges, percent of Medicare or other benchmark, per-diem, case rate, DRG-based payment, capitation, bundled payment, reference-based price, or otherwise; (ii) any discount, adjustment, withhold, bonus, settlement, reconciliation, outlier payment, stop-loss provision, or other modification to such amounts; (iii) any amount actually paid or payable to the provider, including any allowed amount, net payment, member cost-sharing component, and patient responsibility amount; (iv) any billed charge, chargemaster amount, or list price of the provider; and (v) any value-based, pay-for-performance, shared-savings, shared-risk, or quality-adjusted payment component.

19.    "Plan benefits," "plan benefit design," and "plan benefit feature" mean, individually and collectively, the terms and conditions of a health plan governing the scope of, access to, utilization of, and cost-sharing for healthcare services, including co-payments, co-insurance, deductibles, out-of-pocket maximums, benefit limits and exclusions, prior

authorization and other utilization management, referral requirements, network and tier differentials, designated-provider differentials, site-of-service restrictions, and any other financial incentive, penalty, or condition built into the plan that incentivizes, deters, or restricts member choice of provider, site of service, or care utilization.

20.    "In-network provider" means any provider (i) listed as an in-network or participating provider in any of your health plans or provider directories; (ii) with which you, your affiliates, or any rental network or other entity acting on your behalf has a contract governing reimbursement, payment, or network participation; or (iii) for which members receive cost-sharing, coverage, or other plan benefits more favorable than those applicable to out-of-network providers for the same type of service.

21.    "Out-of-network provider" means any provider that is not an in-network provider.

22.    "Network" means any set of in-network providers maintained by you and made available, in whole or in part, through one or more of your health plans, products, or product lines.

23.    "Open access network" means any network you market, promote, or describe as providing broad, open, or unrestricted access to providers, including any network referred to as a PPO, broad-network, or open access product.

24.    "Narrow network" means any network (i) with fewer providers than your broadest network in the relevant area; or (ii) you market, promote, describe, or refer to as a narrow, limited, select, or focused network.

25.    "Tiered network" means any network (i) in which providers are assigned to one or more of multiple tiers and members are subject to different plan benefits based on the tier of the provider used; or (ii) you market, promote, describe, or refer to as a tiered network or any variant thereof.

26.    "Restricted choice network" means any network that excludes one or more providers that you include in another of your networks, where that exclusion results in less favorable plan benefits for members who use the excluded providers than for members who use the included providers.

27.    "Limited provider network or plan" or "LPNP" means any network or plan that is or uses a narrow network, tiered network, or restricted choice network.

28.    "Designated-provider program" or "DPP" means any program, designation, arrangement, or product through which you identify, designate, or treat any provider, facility, or set of providers differently from other in-network providers for any procedure, service line, or category of care — whether based on quality, cost, volume, bundled pricing, reference pricing, geographic redirection, or any other criterion — including without limitation any Center of Excellence, Premium Designation, Blue Distinction Center, Institute of Quality, Center of Distinction, Specialty Care designation, high-performance network, value-based program, preferred provider arrangement, bundled-payment program, reference-based pricing arrangement, or similar program by any name.

14

29.    "Site-of-service provision" means any plan design or policy that incentivizes or requires members to receive a particular healthcare service at a particular type or location of provider (such as an ambulatory surgery center rather than a hospital outpatient department).

30.    "Network design" means the structure and composition of any network, including the selection, inclusion, exclusion, tiering, or designation of providers; the relationship between the network and plan benefits; and any analysis or decision-making concerning the foregoing.

31.    "Network placement provision" means any provision in any provider contract or agreement relating to the inclusion, exclusion, tiering, or designation of a provider in any network, plan, product, or designated-provider program, including (i) any in-network or out-of-network designation; (ii) any All Products, most-favored-nation, or guaranteed-inclusion provision; (iii) any provision relating to steering, anti-steering, tiering, anti-tiering, discrimination, anti-discrimination, parity, equality, preference, or favored treatment; and (iv) any provision concerning the plan benefits members will receive for using the provider, including any difference, equivalence, parity, or preference in plan benefits compared to those applicable to other providers.

32.    "All Products provision" means any provision in any provider contract or agreement that (i) is referred to as an All Products provision or any variant thereof; (ii) provides in sum or substance that a provider will be deemed in-network for all or substantially all of the services it is licensed to provide, unless expressly carved out or otherwise agreed; or (iii) provides in sum or substance that a provider will be deemed in-network for all or substantially all of your plans, product lines, or networks offered, unless expressly carved out or otherwise agreed.

33.    "Steering" means any action, program, design, or activity that (i) is referred to as steering, anti-steering, or any variant thereof; or (ii) is intended to or has the effect of influencing, directing, incentivizing, encouraging, or discouraging members or customers from using particular providers, sites of service, or care settings, by any means, including network design, plan benefits, designated-provider programs, member communications, and care navigation.

34.    "BATNA" means a party's best alternative to a negotiated agreement – the course of action or outcome it would pursue if a contract or negotiation were not reached or were terminated, however denominated – and any document titled or labeled as a "BATNA" or "best alternative to a negotiated agreement."

35.    "Two-stage competition" means the two-stage structure of competition in healthcare, consisting of stage one competition and stage two competition.

36.    "Stage one competition" means competition among healthcare providers for inclusion in or favorable placement within a network, network tier, or designated-provider program.

37.    "Stage two competition" means competition among providers included in a health plan's network or benefit tier for patient volume at the point of care, including through price

(whether reflected in co-payments, co-insurance, deductibles, policy limits, or out-of-pocket exposure), quality, service offerings, and other non-price attributes.

### III.   INSTRUCTIONS

1.   Unless otherwise specified, these requests seek documents created, sent, received, or in effect at any time during the Relevant Period.  Specifications 9, 30, 31, 38, and 39 are not limited to the Relevant Period, but seek responsive documents regardless of date.

2.   Unless otherwise extended, objections to the subpoena or any request is due 14 days after service.  Documents should be produced within 30 days after service.  NYP is willing to meet and confer concerning a schedule for rolling production by custodian.

3.   If you assert any objection to a request, the objection must state with specificity (i) the grounds for the objection; (ii) whether and to what extent any responsive documents are being withheld on the basis of the objection; and (iii) any limitations being applied to the scope of your response or production.  If you withhold responsive information on the basis of any general or specific objection, you must so expressly indicate.

4.   Responsive documents shall be produced as they are kept in the ordinary course of business or shall be organized and labeled to correspond with the categories in the request. Documents attached to each other must not be separated.  All produced documents shall include all attachments, parents, and children.  Hard-copy documents shall be produced as scanned TIFF images with searchable OCR text and accompanying load files; native files (including PowerPoint, Excel, spreadsheets, transactional or financial data, and any color document) shall be produced in native format with metadata preserved.

5.   Electronic documents shall be produced in their native format or, if appropriate, as single-page TIFF images with accompanying OCR text and load files in standard Concordance/Relativity format.   All metadata fields shall be produced, including: Custodian, Bates Begin/End, Attachment Begin/End, Family Range, Author, From, To, Cc, Bcc, Subject, Date Sent, Date Received, Date Created, Date Last Modified, File Name, File Extension, File Path, MD5 Hash, Page Count, Native Path, and Confidentiality Designation.

6.   Any document withheld or redacted in whole or in part on the basis of any privilege or protection (including the attorney-client privilege, the attorney work-product doctrine, the joint-defense privilege, the common-interest privilege, or any other privilege or protection) must be identified on a privilege log that includes, for each document: (i) a unique privilege identification number; (ii) the beginning and ending Bates numbers (and family range, if applicable); (iii) the date of the document; (iv) the type of document; (v) the author(s), addressee(s), and all recipients (including blind copies), with attorneys denoted by an asterisk "*"; (vi) a description of the document's subject matter sufficient to assess the claim of privilege; and (vii) the specific privilege or protection asserted (and, for work-product claims, the specific anticipated or pending litigation or proceeding).

7.   Any structured data called for by these requests shall be produced electronically in a reasonably useable compilation that will allow NYP to access and analyze the information. For each database or data set produced, provide: (i) a description of the database or data set, including its software platform, type (flat, relational, or enterprise), sources, regularly

17

prepared reports, query forms, and the entity within your organization that maintains the data; (ii) a complete data dictionary, including, for each table, the table name, a general description, the size (records and megabytes), the list of fields, the format of each field, a definition of each field (including the meaning of all code values), the primary and foreign keys, and an indication of which fields are populated; (iii) for relational or enterprise databases, an entity-relationship diagram showing the relationships among tables; and (iv) a representative sample of complete observations sufficient for NYP to assess the data prior to any full production.

8.      For each production of structured data, also produce: (i) all lookup tables, crosswalks, reference tables, and code keys necessary to interpret the data, including tables or files for reason codes, adjustment codes, remark codes, denial categories, product codes, funding-type codes, provider-type codes, network-status codes, contract-status codes, and any other code key referenced in the produced data; (ii) source-system identifications, date ranges covered, and extraction logic, selection criteria, inclusion and exclusion rules, and any material transformation or normalization applied to the data; and (iii) the name, title, and contact information of at least one person knowledgeable about the data sufficient to permit meet-and-confer regarding interpretation, loading, and analysis. All date fields shall be produced in a standard date format (and date-time fields shall include time zone if maintained); monetary fields shall identify currency and decimal precision; and all identifier fields used to connect tables shall be produced in a consistent format sufficient to permit relational analysis.

9.      Before using search terms, technology-assisted review, predictive coding, deduplication, email threading, analytics, or similar software or technology to identify, cull, or eliminate potentially responsive documents or data, you shall disclose in writing the method or methods used.

10.     You should produce all ESI in accordance with the ESI Guidelines attached as Exhibit B.

11.     You are not required to use search terms. But if you elect to use search terms in connection with your collection, review, or production of documents, you must (i) disclose the use of search terms in advance, (ii) disclose all stop words, noise wors, connectors, operators, wildcards, stemming or fizziness settings, or filters used; and (iii) run the terms set forth in Exhibit C, with such platform-specific modifications (including hyphenation and wildcards) as are necessary to execute them, and (iv) expand the Exhibit C terms to capture all reasonable variations and additional terms reasonably designed to identify responsive documents, including plurals and inflected forms; abbreviations and acronyms; common misspellings and typographical variants; hyphenated, unhyphenated, spaced, and compound forms; and the nomenclature, code names, and shorthand used by your personnel in formal and informal communications (*e.g.*, texts and chats). Nothing in this paragraph relieves you of, or lessens, your obligations under the Federal Rules of Civil Procedure to produce all responsive, non-privileged documents in your possession, custody, or control, whether or not captured by any search term.

12.     The headings and taglines in these requests are for organizational convenience only and shall not be used to limit, interpret, or modify the scope of any request.

18

13.     The operative Complaint in this action is attached hereto as Exhibit D.